In the Matter of EVANS TEMPLE CHURCH OF GOD IN CHRIST AND COMMUNITY CENTER, INC., Debtor.

EVANS TEMPLE CHURCH OF GOD IN CHRIST AND COMMUNITY CENTER, INC., Plaintiff,

v.

The CARNEGIE BODY COMPANY, et al., Defendant.

Bankruptcy No. B84–00192–Y.
Adv. No. 84–0084.

United States Bankruptcy Court,
N.D. Ohio.

Jan. 2, 1986.

Willie Evans, II, Pastor of Evans Temple Church of God in Christ and Community Center, debtor.

M. Colette Gibbons, Cleveland, Ohio, for Carnegie Body Co.

William R. Sremack, Akron, Ohio, for Associates Commercial Corp.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This matter is before the Court upon Defendant Carnegie Auto Body's Motion for Summary Judgment in the above-captioned adversary proceeding. The Motion for Summary Judgment is sustained in part and overruled in part. A trial shall be set

on the issues determined herein to be in question.

### FACTS

Although some factual matters in this case are in dispute, a summary of events may be fashioned from the facts which are not in dispute.

In September, 1983, the Reverend Willie Evans, III, (Debtor Evans) and the Evans Temple Church of God in Christ and Community Center (Debtor Church) engaged Defendant Carnegie Auto Body to perform certain repairs on a 1977 International Dump Truck which was titled to Debtor Church and subject to a perfected security interest in favor of Associates Commercial Corporation in the amount of Thirteen Thousand & 00/100 Dollars ($13,000.00). The cost of the repairs was initially agreed upon in the approximate amount of Sixteen Thousand, Five Hundred & 00/100 Dollars ($16,500.00). However, the inclusion of additional charges caused the final bill for repair of the truck to be in the amount of Seventeen Thousand, Eight Hundred Eleven & 55/100 Dollars ($17,811.55).

On December 9, 1983, Carnegie received a check from Emmco Insurance Company in the amount Twelve Thousand & 00/100 Dollars ($12,000.00), which check was made payable to Debtor Evans, Debtor Church, and Carnegie. It is disputed whether Evans and Church endorsed the check. Nonetheless, Carnegie negotiated the check but refused to release the truck, asserting an artisan's lien for repairs, until the balance of Five Thousand, Eight Hundred Eleven & 25/100 Dollars ($5,811.25) was paid, or until arrangements were made for payment.

On February 23, 1984, Evans filed a pro se petition for relief under Chapter 11 of the Bankruptcy Code. The case was designated as Case Number B84–00192–Y. Both Defendants, Carnegie and Associates, were listed as creditors.

On March 5, 1984, Carnegie filed a Motion for Relief from the Automatic Stay, relying on its "statutory mechanic's lien interest," and asked that it be allowed to proceed against the truck and remit any excess proceeds to "the trustee." A hearing was set for March 27, 1984, before Judge Harold F. White. This hearing was continued to April 3, 1984.

On March 29, 1984, Associates also filed a motion for relief from the automatic stay, asking the Court to permit it to foreclose upon its interest in the truck. A hearing was scheduled for April 24, 1984.

On April 3, 1984, Evans filed an amended pro se petition in Case Number B84–00192–Y, naming both himself and the Church as debtors. The hearing on Carnegie's motion for relief from stay was continued to April 24, 1984.

On April 24, a hearing was held before Judge White on the motions of Carnegie and Associates for relief from the stay. The Court's records do not disclose the substance of that hearing. The records do disclose, however, that Brian Bash, Esq., appeared on behalf of Carnegie and that James Beck, Esq., appeared on behalf of debtors, although an appearance by him as counsel for Debtors was not formally entered on the docket until April 27, 1984.

On May 1, 1984, Judge James Williams entered an Order granting relief from the stay to Carnegie and allowing Carnegie to sell the truck to satisfy its lien interest. The basis for the ruling was that the truck was titled in the name of the Church and since Evans, individually, was the Debtor in the case, the stay had no effect on assets belonging to the Church. The record does not disclose whether Judge Williams was apprised of the amended petition filed in the name of Debtor and the Church, but we acknowledge the fact that an individual and a corporation may not file a joint petition.[1] Thus, despite the fact that an amended petition had been filed in the name of Evans and the Church, Judge Williams right-

---

**1.** A joint case under the Bankruptcy Code may be commenced only by an individual and such individual's spouse. 11 U.S.C., Sec. 302(a).

fully concluded that the Debtor in Case Number B84–00192–Y was Evans individually and that the stay had no effect upon the assets of the Church. Associates' motion for relief from the stay was never ruled upon.

On June 5, 1984, Case Number B84–00192–Y was amended to name the Church as the Debtor. A new petition was filed naming Evans, individually, as the Debtor. This new petition was designated as Case Number B84–00558–Y. On June 12, 1984, Attorney Beck, on behalf of Evans and the Church, moved the Court for an Order authorizing joint administration and consolidation of the two cases. The motion was granted on July 24, 1984.

On or about June 12, 1984, a public sale of the truck was held. The record is in dispute as to who acquired the truck and how much was paid for it. In its Answer to the Complaint herein, Associates admits that it received the sum of Thirteen Thousand & 00/100 Dollars ($13,000.00) from Carnegie as and for consideration of the purchase of the dump truck, but acknowledges it never cancelled its lien rights on the truck. However, attached to Carnegie's Motion for Summary Judgment are two affidavits. One is an affidavit of Franklin Weisblatt, President of Carnegie Body, wherein he states that Udelson Equipment Company purchased the truck from Associates Commercial Corporation for Thirteen Thousand & 00/100 Dollars ($13,000.00) on August 29, 1984, and denies that Carnegie Body ever took title to the truck. The second affidavit is that of David Udelson, Vice-President of Udelson Equipment Company. Udelson's affidavit corroborates that of Weisblatt, to wit: that Udelson purchased the truck from Associates Commercial Corporation on August 29, 1984, for Thirteen Thousand & 00/100 Dollars ($13,000.00).

Despite these discrepancies, it is apparent that a public sale had been held sometime between May 1, 1984, and July 16, 1984, because on July 16, Associates Commercial Corporation filed a request to the Court for instructions. The request represented that a public sale had been held, that a buyer had been determined, that the buyer had been informed that his interest would be subject to Court authorization, and that Associates desired instructions from the Court on how to proceed. By letter dated July 25, 1984, Judge White denied the request for instructions, stating that the Court had relinquished jurisdiction of the truck when it granted relief from stay to Carnegie on May 1, 1984.

On August 14, 1984, Debtor filed a complaint for turnover against Carnegie and Associates alleging that the Twelve Thousand & 00/100 Dollars ($12,000.00) payment to Carnegie by Emmco Insurance constituted a preference and that the lien claim of Carnegie was voidable under 11 U.S.C. Sections 544 and 545. Debtor requested that the Court enter an Order determining the lien claim of Carnegie to be void, requiring a turnover of the truck to Debtor-in-Possession and requiring the return of the Twelve Thousand & 00/100 Dollar ($12,000.00) insurance payment made to Carnegie.

There are a number of documents in the record to indicate activity with regard to the truck after the complaint was filed. On August 29, 1984, a cashier's check in the amount of Thirteen Thousand & 00/100 Dollars ($13,000.00) was made payable to Associates and negotiated by it. On August 29, 1984, Associates filed a repossession title and obtained "legal" ownership of the truck. On October 31, 1984, a quitclaim bill of sale of the truck was signed by Associates as seller. Carnegie was indicated as the buyer but no signature of any of its officers is included on the document. On October 11, 1984, a new title was filed indicating that the previous owner of the truck, Associates, had transferred the truck to Udelson Equipment Company on resale. No purchase price was disclosed.

On November 13, 1984, an Amended Complaint was filed herein which included two additional counts. Count II alleged that Carnegie had purchased the truck from Associates and had transferred to a third party, these actions constituting con-

version on the part of Associates and Carnegie. Debtors sought return of the truck or its equivalent, the truck being valued by them at Thirty-Three Thousand, Seven Hundred Ninety-Five & 00/100 Dollars ($33,795.00). Count III alleged that the actions of Carnegie and Associates were in violation of the automatic stay inasmuch as a new stay was effected by the filing of the amended petitions on June 5, 1984, subsequent to the granting of relief to Carnegie on May 1, 1984. Debtor requested that the Court require return of the truck or, in the alternative, damages for conversion, and that the Court find Carnegie and Associates in contempt for violation of the automatic stay.

Both Carnegie and Associates filed Answers to the Complaint. Carnegie denied that payment to it constituted a preferential payment made within ninety days of the filing of the petition for relief because it received the payment on December 9, 1983, and the Church, the entity to which the truck was titled, did not file its separate petition until June 5, 1984. In addition, Carnegie asserted that the payment had been intended by the parties to be a contemporaneous exchange for new value and not on account of an antecedent debt. Carnegie also denied that it had converted the Thirteen Thousand & 00/100 Dollar ($13,000.00) insurance payment. Associates cross-claimed against Carnegie, stating that if the truck had been transferred to a third party, Carnegie had done it and that Carnegie should indemnify Associates for any liability imposed by the Court upon it. Carnegie, in its Answer to the Cross-claim, denied that it purchased the truck from Associates and denied responsibility for any indemnification to Associates.

On March 15, 1985, Carnegie filed a Motion for Summary Judgment, alleging that there was no genuine issue as to any material fact and that it was entitled to judgment as a matter of law. The main issues presented in the Motion for Summary Judgment are as follows:

1. May the Church avail itself of the February 23, 1984, filing date for purposes of determining whether Carnegie Body Company received a preference under 11 U.S.C., Section 547?

2. Was the payment to Carnegie Body Company by Emmco Insurance a payment for new value and not on account of an antecedent debt?

3. Did Carnegie Body Company violate the provisions of 11 U.S.C., Section 362, by assisting Associates Commercial Corporation in disposing of the truck?

4. Does or did the Debtor have equity in the truck?

Issues one and two relate to the preference count of Debtors' Complaint. Issues three and four relate to the conversion and violation of stay counts. We deal first with the issues relating to the preference allegations.

### 1. *Preferences Under the Code*

#### A) Generally.

For a payment to a creditor to constitute a voidable preference under 11 U.S.C. Section 547, six elements must be shown to exist. They are: 1) a transfer of an interest of the debtor in property; (2) to or for the benefit of the creditor; (3) for or on account of an antecedent debt owed by the debtor before such transfer was made; (4) made while the debtor was insolvent; (5) made on or within 90 days before the date of the filing of the petition or between ninety days and one year before the date of filing of the petition if the creditor was an insider; and (6) the transfer enables the creditor to receive more than he would have received (i) if the case were a liquidation case, (ii) if the transfer had not been made, and (iii) if the claim were allowed or disallowed to the extent permitted by Title 11. 4 *Collier on Bankruptcy*, Sec. 547.01 at 547–11–12. If any one of the elements of a preference as enumerated in Section 547 is wanting, a preference within the meaning of Section 547 has not been established. *Id.* In addition, the transfer must not fall under the category of transactions

enumerated in Section 547(c), the exceptions to the preference provisions of Section 547(b). The subsections of Section 547(c) in issue in this case are:

1. A contemporaneous exchange for new value given to the debtor; and

2. A transfer made in the ordinary course of business or financial affairs of the debtor and the transferee and according to ordinary business terms.

In the instant case, it is beyond dispute that the Twelve Thousand Dollar ($12,-000.00) payment constituted "an interest of the debtor in property." See *In re Moscowitz*, 13 B.R. 357, 14 B.R. 677 (Bankr.S.D.N.Y.1981); Application to appeal denied, 14 B.R. 307 (DC S.D.N.Y.1981); *In re L.B. Smith, Inc., of Virginia*, 37 B.R. 460 (Bankr.D.Md.1984). It is also not disputed that the transfer was "to or for the benefit of a creditor." The remaining elements of a preference under Section 547 are in issue, however. The computation of the 90-day preference period is the first issue with which we must deal, for if the Court determines that the Church may not avail itself of the February 23, 1985, filing date (the date that Evans, individually, filed his first Chapter 11 petition), then there will be no need to reach the other issues presented on the preference Count and Carnegie will be entitled to Summary Judgment on that Count.

B). The Effect of Substantive Consolidation Upon The Computation of the Preference Period.

■ In order to determine whether the Church may avail itself of the February 23, 1984, filing date, we must determine the effect, if any, of the substantive consolidation of the two estates upon the computation of the 90-day preference period. Debtors argue that the substantive consolidation of amended case number B84–00192–Y and case number B84–00558–Y caused a "relation back" of the Church's petition to the original filing date of February 23, 1984, thus causing the transfer to fall within the ninety-day preference period. Car-

negie argues that the consolidation of the cases was solely for the purpose of ease of administration and that the substantive rights of creditors were not, and should not, be affected and that, therefore, the substantive consolidation of the cases caused no "relation back" to the date of the original filing. For the reasons set forth below, we agree with Debtors and hold that the substantive consolidation of the cases caused a relation back to the February 23, 1984 filing by Evans and that, therefore, both the Church and Evans are entitled to use the February 23, 1984, filing date to determine whether the payment to Carnegie fell within the ninety-day preference period.

Substantive consolidation must be distinguished from joint administration and consolidation under Bankruptcy Rule 1015. Under Rule 1015,

Consolidation of cases implies a unitary administration of the estate and will ordinarily be indicated under the circumstances to which subdivision (a) applies [two or more petitions pending in the same court by or against the same debtor]. This rule does not deal with the consolidation of cases involving two or more separate debtors. Consolidation of the estates of separate debtors may sometimes be appropriate, as when the affairs of an individual and a corporation owned or controlled by that individual are so intermingled that the Court cannot separate their assets and liabilities. Consolidation, as distinguished from joint administration, is neither authorized nor prohibited by this rule since the propriety of consolidation depends on substantive considerations and affects the substantive rights of the creditors of the different estates.

Bankr.R. 1015, Advisory Committee Note.

■ Substantive consolidation is employed in cases where the interrelationships of the debtors are hopelessly obscured and the time and expense necessary to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all of the creditors. *Chemical Bank v.*

*New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966); *In re Snider Bros., Inc.,* 18 B.R. 230 (Bankr.D.Mass.1982). In any consolidated case, there is implicit in the Court's decision to consolidate the conclusion that the practical necessity of consolidation to protect the possible realization of any recovery for the majority of the unsecured creditors far outweighs the prospective harm to any particular creditor. *See generally, In re Snider Bros., Inc., supra.*

Thus, when a case is substantively consolidated, the Order for consolidation is, in effect, a determination by the Court that consolidation is warranted by the circumstances of the cases and that it is in the best interest of unsecured creditors to join the assets and liabilities of two debtors. It is, in effect, a statement by the Court that the assets and liabilities of one debtor are substantially the same assets and liabilities of the second debtor, or that the two are hopelessly intertwined, and that the unsecured creditors of both debtors would best be protected by pooling the assets and liabilities of the two debtors.

Turning to the reasoning behind the preference provision of Section 547, it is well-established that the purpose of the preference section is twofold:

First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and most important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy

furthers the second goal of the preference section—that of equality of distribution.

H.R.Rep. No. 595, 95th Cong., 1st Sess., 177–78 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6138, cited in 4 *Collier on Bankruptcy,* Sec. 547.03 at 547–20 (15th ed.).

We have found no authority on the issue of whether a debtor who files a petition for relief under the Bankruptcy Code subsequent to the filing by an affiliate may avail itself of the earlier date for purposes of the preference provisions when the cases are later substantively consolidated. So far as we can tell, no decision on this issue has ever been reported. However, an analysis of the purposes behind the doctrine of substantive consolidation and of the preference provisions leads us to conclude that the latter-filing debtor may avail itself of the earlier filing date.

If the reasons for substantively consolidating two cases filed under the Code is to protect the unsecured creditors of both debtors where the assets and liabilities of the debtors are so intermingled as to make them substantially the same, and if the purpose of the preference provisions is to assure equality of distribution among all creditors, then it logically follows that where two cases are substantively consolidated upon a determination by the Court that the assets and liabilities of each debtor are not clearly separable, the preference provisions require us to treat the creditors of both debtors in substantially the same manner. In order for us to do so, we must assign a like filing date to both Debtors for purposes of the preference provisions. We hold that the Church may avail itself of the February 23, 1984, filing date for purposes of determining whether the payment to Carnegie Body constituted a preference under Section 547.

We believe our conclusion to lie within the spirit and purposes of the Bankruptcy Code. Moreover, we do not believe our conclusion to be manifestly unfair to Carnegie or Associates. When Evans filed his first individual pro se petition on February

23, 1984, both Carnegie and Associates were listed as creditors. Neither Carnegie nor Associates denied that it was a creditor of Evans individually. In the pleadings, Carnegie refers to all actions taken by Debtors as undertaken by "Reverend Willie Evans, II, *and/or* Evans Temple Church of God in Christ and Community Center, Inc." If the parties herein cannot attribute actions to the separate Debtors, it seems to us that the only fair and reasonable conclusion is that Evans and the Church are substantially the same Debtor and that the Church must be permitted to avail itself of the February 23, 1984, filing date. Only by doing so will all creditors be protected.

C). Payments for New Value and Not on Account of an Antecedent Debt.

■ The next issue with which we must deal is whether the payment to Carnegie by Emmco Insurance was a payment for "new value" and not "on account of an antecedent debt." Carnegie argues that the transfer to it was a contemporaneous exchange for new value and not on account of an antecedent debt. These allegations raise a bifurcated issue, requiring us to analyze both the preference provisions of Section 547(b) and the exception found in Section 547(c)(1).

11 U.S.C. Section 547(b) lists, as one of the elements of a preference, the requirement that the transfer be "for or on account of an antecedent debt owed by the debtor before such transfer was made." Carnegie argues that the Twelve Thousand Dollar ($12,000.00) payment to it was not made on account of an antecedent debt because payment was made within several weeks of the collision which necessitated the repairs and cites *Ledford v. Ft. Hamilton Hughes Memorial Hospital,* 15 B.R. 573 (Bankr.S.D.Ohio 1981) in support. Debtors argue that *Ledford* is easily distinguishable from the instant case in that, in *Ledford,* the payment to the creditor was made before services were rendered, while here payment was made after the services were rendered. We agree with Debtors and hold that *Ledford* is not applicable to

the instant case and that the payment to Carnegie was made on account of an antecedent debt owed to it by Debtors. Further, Carnegie's assertion of its common law artisan's lien rights presupposes the existance of an obligation to it from Debtor; thereby acknowledging an indebtedness which arose prior to the payment by the insurance company. Thus, this element of a preference is present in this case. However, Carnegie asserts that the exception found in Section 547(c)(1) is applicable here. That exception provides that if the transfer was intended by the parties to be a contemporaneous exchange for new value given to the debtor and if the transfer was, in fact, a substantially contemporaneous exchange, then the transfer is not subject to avoidance. Carnegie argues that the transaction in question here was intended to be a contemporaneous exchange and that the exchange was, in fact, substantially contemporaneous because the insurance check was received within a few weeks of completion of the work.

■ The Sixth Circuit has considered the exception contained in Section 547(c)(1). In *Ray v. Security Mutual Finance Corp. (In re Arnett),* 731 F.2d 358 (1984), the Sixth Circuit declared:

> In enacting the 'contemporaneous exchange' exception, Congress intended to codify decisions under the old bankruptcy act which had held that, when a cash sale was intended, acceptance of a check instead of cash did not change the character of the transaction, so long as the check was cashed within a reasonable period of time....
>
> [I]t is clear that the classic exception to avoidance intended by Congress to be reflected in Section 547(c)(1) is the exchange of goods or other 'value' for a check. Such transactions are generally intended to be cash transactions, although some extension of credit is necessarily involved until the check is negotiated....
>
> Congress was concerned that these essentially cash transactions not be converted to credit transactions because of

delay in depositing checks intended as cash payments.

*Id.* at 361.

The Sixth Circuit has taken the view that Congress intended the Section 547(c)(1) exception to be applicable to what are essentially cash transactions where payment is made by check. *See also, Thomas W. Garland, Inc. v. Union Electric Co.,* 19 B.R. 920, 6 C.B.C.2d 1259 (Bankr.E.D.Mo.1982). It is obvious to us that the transaction in question here cannot be viewed as a cash transaction. The work was completed and payment did not follow until weeks later. Carnegie has offered no reason why it should be preferred over other creditors who extended goods and services to Debtors within a like time period preceding the filings. In a case arising under the Bankruptcy Act, the Court for the Southern District of Ohio stated:

> If the parties, by agreement, can treat a sale of goods on 10 days' time as a cash transaction, they may also, by agreement, treat a sale on 30 or 60 days' or longer time as a cash transaction, and practically defeat the operation of Sections 57g and 60a of the Bankrupt Act. Sections 57g and 60a of the Bankrupt Act do not contemplate a usage of merchants or a conventional arrangement between the parties which would enable any one of the creditors of a bankrupt to obtain a greater percentage of his debt than any other of such creditors of the same class. A sale of goods to be paid for in 10 or 30 days is not, in fact, a cash transaction, and cannot, by agreement of the parties, or a usage of merchants, be regarded as such within the meaning of the bankrupt law.

*In re John Morrow & Co.,* 134 Fed. 686, 687–88 (S.D.Ohio 1901).

We hold that the "contemporaneous exchange" exception found in 11 U.S.C. Section 547(c)(1) is not applicable here.

### D). The Ordinary Course of Business Exception

■ Carnegie also contends that the transfer of the Twelve Thousand Dollar ($12,000.00) insurance check to it by Emmco was in payment of a debt incurred by Debtors in the ordinary course of business or financial affairs of Debtors and Carnegie, thus qualifying the transaction for an exception to the preference provisions under 11 U.S.C. Section 547(c)(2). We do not agree. The ordinary course of business exception found in Section 547(c)(2) contemplates normal credit transactions such as the sale of goods from a business supplier on account or the payment of monthly utility bills. *Kallen v. Litas,* 47 B.R. 977 (N.D.Ill.1985); *In re Peninsula Roofing & Sheet Metal Inc.,* 9 B.R. 257, 261 (Bankr.W.D.Mich.1981). The relationship between Carnegie and Debtors in this case did not arise in the course of such an ordinary trade credit transaction. Rather, the relationship arose in the context of a one-time repair job performed by Carnegie for Debtors. Clearly, this is not the type of transaction contemplated by Congress in drafting the ordinary course exception. Senate Report No. 95–989, 95th Cong., 2nd Sess. 88 (1978). We hold that the ordinary course of business exception is inapplicable to this case.

### E). The "Liquidation Test"

■ Although Carnegie has not specifically dealt with it in its motion for summary judgment, we feel that there is one more issue which ought to be addressed on the preference count. The issue involves the interrelationship of the "liquidation test" of Section 547(b) and the value of the vehicle at the time Carnegie received payment. To crystalize the issue, a reiteration of the facts is necessary.

It is not disputed that Associates held a security interest on the truck in question in the amount of Thirteen Thousand Dollars ($13,000.00) and that the lien was noted on the certificate of title. It is also not disputed that a common law lien for services arose in favor of Carnegie upon completion of the repairs on the truck. Under Ohio law, a lien noted on the certificate of title of a motor vehicle prevails over an artisan's lien on that motor vehicle. *Common-*

*wealth Loan Co. v. Berry,* 2 Ohio St. 2d 169, 207 N.E.2d 545 (1965). It follows that Associates' lien would have been superior to Carnegie's lien if this had been a Chapter 7 proceeding and the assets of Debtors had been liquidated. If the truck was worth Thirteen Thousand to Fifteen Thousand Dollars ($13,000.00–$15,000.00) at the time these transactions occurred, as both Carnegie and Associates have suggested, then the Twelve Thousand Dollar ($12,-000.00) payment to Carnegie resulted in a dividend to Carnegie in excess of what it would have received in a Chapter 7 liquidation and the final element of the preference test would be met. If, on the other hand, the Court would accept Debtors' valuation of the truck at approximately Thirty-Three Thousand Dollars ($33,000.00), then it would follow that the total amount of liens on the vehicle would not exceed the fair market value and, thus, the payment to Carnegie would be viewed as non-preferential since Carnegie received an amount equal to or less than it would have received in a Chapter 7 liquidation. Since there is a material fact in issue; i.e., the value of the truck at the time of payment to Carnegie, we hold that summary judgment is not appropriate on the preference count of the Complaint.

2). *Violation of the Automatic Stay and Conversion*

■ The final issues to be addressed involve Debtors' allegations that the acts of Carnegie and Associates with regard to the sale of the truck in question constituted conversion and violation of the Section 362 automatic stay. Carnegie argues that since it never took title to the truck, it cannot be made subject to the finding of a stay violation or conversion. Carnegie also argues that it and Associates "were acting in accordance with the Court's Order" and that they should not be penalized "when extreme care and caution characterized all aspects" of their actions. We recall that Carnegie had been granted relief from the automatic stay on May 1, 1984, prior to the filing of the amended petitions by Debtors. Debtors argue that a new stay was created

by the filings which took place on June 5, 1985, and that Carnegie and Associates should have again sought relief from the automatic stay before taking any action with regard to the truck. Whatever merit Debtors' argument may have, however, we find the violation of the stay count of the Complaint to be moot. Our finding is based upon Judge White's letter of July 12, 1984, wherein he denied Associates' request for instructions and stated that the Court had relinquished jurisdiction of the truck. Taking that letter as a granting of relief from the automatic stay, we find that Carnegie and Associates believed that they were acting in accordance with the Court's instructions and that they cannot be penalized by a finding of contempt in this case.

■ Our inquiry on the conversion count does not end here, however. Despite the fact that Carnegie and Associates were entitled to proceed against the truck, nonetheless, they were under a duty to proceed with the sale in a commercially reasonable manner. It is not clear to us that they did so. There is evidence that the truck may have been worth substantially more than the Thirteen to Fifteen Thousand Dollars ($13,000.00–$15,000.00) value which Carnegie places upon it. If that is the case, then Carnegie and/or Associates may be under some obligation to account to the estate. Thus, although we find summary judgment to be appropriate on the contempt count of the Complaint, we hold that it is not appropriate on the conversion count.

This adversary proceeding arose as a result of a multitude of uncustomary events involving all the parties hereto, the first of which was the filing of the initial Chapter 11 petition by Debtor Evans without the assistance of counsel. To date, Debtors are still without counsel, as the Court has permitted withdrawal by Attorney Beck, who instituted this adversary proceeding on behalf of Debtors. No disclosure statement or plan have been filed to date, and Debtors are behind in the filing of their DIP reports. There have been motions to dismiss the proceedings by another secured creditor of Debtors and if this case had

proceeded in an ordinary manner, we would have considered those motions long ago. However, we find some allegations contained in the Complaint to raise issues appropriate for further consideration; and, depending upon the outcome at trial, those issues raised in this adversary proceeding could result in some benefit to the estate, for the benefit of creditors. Accordingly, we overrule Carnegie's motion for summary judgment on all counts except for the contempt charge. A trial will be set on the issue of the value of the truck at the time these transactions took place, as that is the pivotal issue on the two remaining counts. An appropriate Order shall issue.