**In re THE BENNETT FUNDING GROUP, INC., Debtors.**

**Richard C. Breeden, Trustee of the Bennett Funding Group, Inc., et al., Plaintiff,**

**v.**

**Northeast Binding Systems, Defendant.**

**Bankruptcy No. 96–61376.**
**Adversary No. 98–42742.**

United States Bankruptcy Court,
N.D. New York.

June 26, 2000.

Saperston & Day, P.C., Special Counsel for § 1104 Trustee, Syracuse, NY, Kenneth M. Alweis, of counsel.

Schoenberg, Fisher, Newman & Rosenberg, Ltd., for Northeast Binding Systems,

Chicago, IL, Robert C. Goldberg, of counsel.

Menter, Rudin & Trivelpiece, P.C., for Northeast Binding Systems, Syracuse, Jeffrey A. Dove, of counsel.

Shumaker, Loop & Kendrick, LLP, for Danka Office Imaging Company, Toledo, OH, David J. Coyle, of counsel.

Weil, Gotshal & Manges, LLP, for Matsushita Electric Corp., New York City, Malora Mathis–Mccullouch, of counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Presently before the Court is a motion for summary judgment ("Motion") filed by Northeast Binding Systems ("Defendant") on November 2, 1999, in connection with a complaint filed against it by Richard C. Breeden ("Trustee") as chapter 11 trustee of The Bennett Funding Group, Inc. ("BFG") and the consolidated estates (collectively, the "Debtors")[1] on March 16, 1998. The Trustee seeks to recover $1,595 paid to the Defendant by Aloha Leasing, a division of BFG[2] on or about March 8, 1996, as a preferential transfer pursuant to § 547(b) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code"). The motion seeks a determination by the Court that Code § 547(c)(2) is a defense available to the Defendant even if the Trustee is able to prove that BFG was operating a Ponzi scheme[3] when the transfer occurred.

On December 16, 1999, and December 17, 1999, responses in support of Defendant's motion were filed on behalf of Matsushita Electric Corporation of America ("Matsushita") and Danka Office Imaging Company ("Danka"), respectively.[4] The Trustee filed his opposition to Defendant's Motion on January 6, 2000, to which Defendant, Matsushita and Danka filed separate replies on January 11, 2000.

The motion was heard on January 13, 2000, at the Court's motion term in Utica, New York. Following oral argument, the Court provided the parties an opportunity to file memoranda of law. The matter was submitted for decision on February 11, 2000.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this adversary

---

1. The Debtors are comprised of eight related entities, including The Bennett Funding Group, Inc., Bennett Receivables Corporation, Bennett Receivables Corporation II, Bennett Management and Development Corporation, The Processing Center, Inc., Resort Service Company, Inc., American Marine International, Ltd. and Aloha Capital Corporation.

2. The Defendant's assertion that it transacted business with "Aloha Leasing" is not disputed by the Trustee. For ease of discussion, the Court takes judicial notice that "Aloha Leasing" was a division of BFG based on prior pleadings in this case.

3. A "Ponzi scheme" has been described as "a financial fraud in which a purported investment venture uses the capital it receives from a new round of investors to pay off its obligations to a previous round of investors, all the while conducting little or no actual business activity. In order to give the appearance of profit, Ponzi schemes must draw in a continually-expanding number of new investors; when the pool of new investors dries up, the Ponzi scheme inevitably collapses." *Breeden v. Thomas (In re The Bennett Funding Group, Inc.),* Case No. 96–61376, Adv. No. 98–40892, slip op. at 6 n. 6 (Bankr.N.D.N.Y. April 29, 1999), citing *Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425, 437 n. 17 (Bankr.N.D.Ill.1995) and cases cited therein; *see also In re Armstrong,* 234 B.R. 899, 902 n. 1 (Bankr.E.D.Ark.1999) (citing *In re Hedged–Investments, Assoc.,* 48 F.3d 470 (10th Cir. 1995)) (indicating that a Ponzi scheme is one in which returns to investors are financed through funds from new investors rather than through the success of the underlying business venture).

4. By Orders signed September 9, 1999, and December 3, 1999, the Court granted Matsushita's and Danka's motions to intervene in the adversary proceeding herein for purposes of this Motion.

proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(F) and (O).

## FACTS

Defendant is a vendor of office equipment. Between 1991 and 1996, the Defendant and Aloha Leasing entered into numerous business transactions. According to Defendant's president, Anthony Yorio ("Yorio"), Aloha Leasing was its "primary referral source for customers desiring to lease office equipment provided by Northeast." *See* Exhibit B of Defendant's Motion at ¶ 3. On March 6, 1996, Aloha Leasing contracted with the Defendant to purchase an IBICO electronic punch binder ("Equipment") for the amount of $1,595. Defendant knew that Aloha Leasing intended to lease the Equipment to a third party. On March 5, 1996, the Defendant delivered the Equipment to Meenan, McDevitt & Co., Inc. ("Meenan") with whom Aloha Leasing had entered into a lease for the equipment. *See id.* at ¶ 5(e). As was the parties' practice, upon delivery of the Equipment, the Defendant submitted an end-user acceptance notice and lease executed by Meenan to Aloha Leasing, along with Defendant's invoice for the Equipment. *See id.* at ¶ 5(f). According to Yorio, after verifying that the equipment had been delivered and was in good working condition, Aloha Leasing would then make payment to the Defendant. *See id.* at ¶ 4(h-i). In this case, on March 8, 1996, Aloha Leasing issued a check to the Defendant in the amount of $1,595. *See id.* at ¶ 5(i).

For purposes of this Motion, the Defendant accepts as true the allegation of the Trustee that BFG operated a Ponzi scheme between 1990 and 1996 whereby one or more of the Debtors entered into transactions with investors who were to receive payments from the Debtors in connection with particular equipment leases pledged to them. Because the Debtors pledged leases that did not exist or pledged the same lease multiple times, the lease collections were insufficient to pay the investors without obtaining additional monies from either banks or new investors. In fact, according to the Trustee, in the three months before the bankruptcy petitions were filed by the Debtors, between $12 and $15 million per month were collected from lessees while Debtors' payments to banks, investors and others totaled in excess of $30 million per month. *See* Affidavit of Manny A. Alas, sworn to March 26, 1997, at ¶ 10. Furthermore, based on his investigation, the Trustee contends that all monies received by the Debtors from whatever source, whether from a bank, an investor or a lessee, were deposited into a single account referred to as the "honeypot."

## ARGUMENTS

The Trustee seeks to avoid and recover the $1,595 paid to the Defendant pursuant to Code § 547(b), alleging that it was a preferential transfer. The Defendant contends that the Trustee may not recover the transfer because it was made in the ordinary course of business. However, the Trustee argues that the Defendant is not entitled to assert an "ordinary course of business" defense pursuant to Code § 547(c)(2) because a debtor operating a Ponzi scheme is not engaged in any legitimate business transactions. The Defendant takes issue with the Trustee's position, asserting that a business need not be legitimate in order for an entity to assert a defense pursuant to Code § 547(c)(2) "as long as the transaction itself is not related to the 'illegal scheme.'" *See* Defendant's Reply, filed Jan. 11, 2000, at ¶ 5. Defendant argues that whether BFG was engaged in fraudulent activities is irrelevant for purposes of determining whether the transfer was preferential pursuant to Code § 547(b). Defendant contends that Code § 547(c)(2) should be a defense available to trade creditors such as itself. Defendant asserts that it did not know and could not have been expected to know that any of the Debtors were operating a Ponzi

scheme. To hold otherwise, Defendant contends would place a substantial burden on trade creditors to investigate each and every company with whom they do business to assure themselves that a customer is not involved in some sort of Ponzi scheme. The Defendant argues that the transaction at issue involved the purchase of equipment by Aloha Leasing for which it made payment in the ordinary course of its business. It is the Defendant's position that any Ponzi scheme involved with that particular transaction did not occur until after Aloha Leasing purchased the equipment. In further support of its argument, the Defendant notes that that portion of the Debtors' business involved in the leasing of equipment was legitimate as evidenced by the Trustee's continued collection of the lease payments postpetition. Defendant refers the Court to a finding by the Second Circuit Court of Appeals that BFG was engaged in the business of "originating, purchasing, and selling commercial leases of copy machines and other office equipment." *See Official Committee of Unsecured Creditors v. Manufacturer's and Traders Trust Co. (In re The Bennett Funding Group, Inc.),* 146 F.3d 136, 137 (2d Cir.1998) ("M & T Decision"). In response the Trustee maintains that the Debtors' "business" was a money losing enterprise and that no leases were entered into to make money but only to acquire the "raw materials for use in furthering the Ponzi scheme." *See* Trustee's Memorandum of Law, filed Jan. 6, 2000, at 8. In support of this position, the Trustee notes that between 1990 and 1996 the Debtors paid approximately $879 million to acquire new leases but collected only $629 million.[5] *See* Trustee's Statement of Undisputed Facts, filed Jan. 6, 2000, at ¶ 20.

Counsel for Matsushita suggests that in opposing the relief sought by the Defendant, the Trustee is attempting to relitigate an issue that was addressed by this Court in granting setoff to Manufacturer's and Traders Trust Co. ("M & T"). In affirming this Court, the Second Circuit Court of Appeals indicated in *dicta* that in exercising its discretion, this Court "was not required to deprive the financial institution of its rights in order to increase the chance of recovery of other equally innocent creditors." *See* M & T Decision at 141. Matsushita's counsel argues that under the law of the case, this Court has ruled that because setoff was available to commercial lending institutions such as M & T "notwithstanding the existence of a 'Ponzi' scheme, the defenses set forth in section 547(c)(2) of the Bankruptcy Code should be equally enforceable with respect to non-investor commercial trade vendors." *See* Matsushita's Reply, filed Jan. 11, 2000, at ¶ 4. The Trustee responds that Matsushita's reliance on the Second Circuit's *dicta* is "misplaced inasmuch as that decision concerned setoff rights under 11 U.S.C. § 553 and not the ordinary course defense [of 11 U.S.C. § 547(c)(2) ]." *See* Trustee's Supplemental Opposition, filed Feb. 10, 2000.

## DISCUSSION

 The issue before the Court is, indeed, a difficult one, which arguably will impact on hundreds of other defendants identified by the Trustee as "trade creditors."[6] With that in mind, it is important to set forth the law governing a motion for summary judgment:

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. The burden of

---

**5.** The statement does not appear to reflect the amount of monies collected by the Trustee postpetition on the leases.

**6.** "Trade" is defined as the "business of buying and selling or bartering goods or services." *See* BLACK'S LAW DICTIONARY 1500 (7th ed.1999). It follows that a "trade creditor" is someone to whom a debt is owed in connection with such a business transaction.

showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.

*Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citations omitted).

■■■ For purposes of this discussion, the parties have agreed to accept the Trustee's assertion that BFG operated a Ponzi scheme between 1990 and 1996. In that context, the Court is to determine whether the Defendant may raise the ordinary course of business defense pursuant to Code § 547(c). The Court rejects the assertion made on behalf of Matsushita that the Trustee is attempting to relitigate an issue that was previously addressed in the M & T Decision. The creditor in that case was a commercial lending institution, not a trade creditor, and as the Trustee correctly points out, the issue before the Court involved M & T's setoff rights under Code § 553 and not the ordinary course of business defense of Code § 547(c)(2). "This circuit ... has repeatedly favored the allowance of setoffs." *In re Bohack Corp.*, 599 F.2d 1160, 1165 (2d Cir.1979). Indeed, "[t]he rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be 'unjust.'" *New Jersey Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952, 957 (2d Cir.1978); *see also Bohack*, 599 F.2d at 1165 (stating that "[t]he statutory remedy of set off should be enforced unless the court finds after due reflection that allowance would not be consistent with the provisions and purposes of the Bankruptcy Act as a whole."). No such favored status

is accorded preferential payments. Instead, it falls to the creditor to establish the applicability of one of the exceptions found in Code § 547(c) if it is to defeat the Trustee's avoidance powers.

Pursuant to Code § 547, a transfer may be avoided as a preference if each of five conditions set forth in the statute is satisfied and none of the exceptions are found to apply. *See Union Bank v. Wolas*, 502 U.S. 151, 154, 112 S.Ct. 527, 529, 116 L.Ed.2d 514 (1991). The affirmative defenses or exceptions set out in Code § 547(c) are to be proven by the transferee. In this case, the Defendant relies on Code § 547(c)(2) in opposing the relief sought by the Trustee. Code § 547(c)(2) provides that a transfer made pursuant to an antecedent debt will not be avoidable if (1) the debt was incurred in the ordinary course of business of the debtor and the transferee; (2) the debt was repaid in the ordinary course of business of the debtor and the transferee, and (3) the transfer was made according to ordinary business terms. 11 U.S.C. § 547(c)(2).

As is often the case, the legislative history of Code § 547(c)(2) provides little in the way of guidance to the Court. According to the House and Senate Reports, "[t]he purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R. REP. No. 595 at 373 (1977); S. REP. No. 989 at 88 (1978). According to the Trustee, Code § 547(b) "ensures that the basic bankruptcy objective of equal treatment among similarly situated creditors is not undermined by eve-of-bankruptcy transfers that have the effect of permitting one creditor to receive more than that creditor's ratable share of the debtor's assets." *See* Trustee's Memorandum of Law at 4, citing Lawrence Ponoff, *Desperate Times and Desperate Measures: The Troubled State of the Ordinary Course of Business Defense—and what to*

*do about it,* 72 WASH. L. REV. at 10–11 (1997). The Trustee contends that it was not Congress' intent to protect those "normal financial relations" which assist in prolonging a debtor's operation of a Ponzi scheme to the detriment of the creditor body.

■ The issue of whether a trade creditor can rely on the "ordinary course of business defense" where the debtor is found to have operated a Ponzi scheme is one of first impression in this Circuit. The one circuit to have expressly addressed the issue did so in *dicta.*[7,8] *See In re M & L Business Machine Co., Inc.,* 84 F.3d 1330, 1340 (10th Cir.1996), citing *Hedged–Investments Associates,* 48 F.3d at 476 (rejecting bright-line rule by indicating that "non-investor" creditors may rely on an ordinary course of business defense notwithstanding the existence of a Ponzi scheme).

■ Although there has been a substantive consolidation of the Debtors' cases,[9] the Court finds it necessary in its analysis to draw a distinction between that portion of the Debtors' business involved with the purchase of the equipment and the origination of the equipment leases and that involved with the pledging of the leases to investors. It is the latter aspect of the Debtors' business that falls within the definition of a Ponzi scheme, namely that it is an *"investment scheme* in which returns to investors are not financed through the success of the underlying business venture ..." *See In re Independent Clearing House Co.,* 41 B.R. 985, 994–95 n. 12 (emphasis added). Based on the allegations of the Trustee that certain leases were multiply pledged to investors and other leases that were pledged to investors did not exist, it appears that the investment portion of the business had no such economic substance and profit potential. Therefore, it is the "underlying business venture" that warrants the Court's consideration in analyzing the applicability of the Code § 547(c)(2) defense to the proceeding herein. The important factor from the Court's perspective is whether that "underlying business venture" had economic substance and a profit potential. The purchase and subsequent lease of equipment arguably had the *potential* for profit. Indeed, as the Defendant points out, the Trustee has continued to collect on the leases postpeti-

---

7. "Dictum" is "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Saranoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986).

8. At least two courts have determined that simply because a debtor is not involved in operating a legitimate business does not mean that transfers made by the debtor to investors in the course of that business may not be subject to the "ordinary course of business" defense found in Code § 547(c)(2). *See In re Independent Clearing House Co.,* 77 B.R. 843, 875 (D.Utah 1987) (indicating that "[a] transfer does not fall outside the scope of section 547(c)(2) simply because it was made in furtherance of a Ponzi scheme."); *In re American Continental Corp.,* 142 B.R. 894, 900 (D.Ariz. 1992) (finding that payments to bond purchasers in connection with an alleged Ponzi scheme were entitled to the protection of Code § 547(c)(2) based on the fact that

Code § 547 "is not, on its face, an antifraud provision. There are independent laws to redress fraud."). *But see Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214, 1219 (9th Cir.1988) (holding that at least in the case of investors Code § 547(c)(2) is not a defense to a preference action where the transfer was made by a "fraudulent business"); *Graulty v. Brooks,* 819 F.2d 214, 216–17 (9th Cir.1987).

9. Consolidation is the process by which the assets and liabilities of two or more debtors whose interrelationships "are hopelessly obscured and the time and expense necessary to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all of the creditors" are combined. *See In re Evans Temple Church of God in Christ & Community Ctr., Inc.,* 55 B.R. 976, 981 (Bankr.N.D.Ohio 1986), citing *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966). Allowing consolidation requires a finding that the potential harm to any particular creditor is outweighed by the interests of the creditor body as a whole. *Evans Temple Church,* 55 B.R. at 982.

tion.[10] The Court has to presume that if it was not profitable to do so, the Trustee would have, in the best interest of the Estate, rejected the leases. Furthermore, there has been nothing to suggest that the leases which did exist and were executed by the Debtors were in any way fraudulent or illegal. Nor has there been any suggestion that the contract for the sale of the Equipment by the Defendant to Aloha Leasing was in any way fraudulent or illegal. The Trustee's statement that the Debtors paid $879 million to acquire new leases from 1990 to the first quarter of 1996 and collected only approximately $629 million from those leases, from which the Court must draw all factual inferences in favor of the Trustee, does not address the value of the leases and the collection thereon postpetition. Admittedly, the Trustee has determined that it was not appropriate to continue the business to the extent of purchasing additional equipment and leasing it to third parties. However, it is also evident that a portion of the underlying business that the Debtors operated had sufficient economic substance and profit *potential* for the Trustee to continue collecting the payments on the leases as they became due postpetition.

While the Trustee places great emphasis on the premise that all creditors be treated equally, the Court believes that the fact that Congress saw fit to allow trade creditors such as the Defendant to establish the ordinary course of business defense should be extended to include debtors whose underlying business has both economic substance and profit potential. The Court does not take issue with those courts that have concluded that Code § 547(c) is not a defense available to *investors* in a Ponzi scheme. In this regard, it is important to remember that Charles Ponzi, "the eponymous architect of the 'Ponzi' scheme" nev-

er engaged in a regular business that had economic substance or profit potential and was insolvent from the beginning. *See Independent Clearing House,* 41 B.R. at 994–95 n. 12. *None* of the money he paid to investors was derived from any profit from his investments; rather he paid them from loans he obtained from other investors. *Id.* The Court concludes that the Defendant should be given the opportunity to establish the *ordinary course of business* defense under the factual circumstances of this case.

Based on the foregoing, it is hereby

ORDERED that the Defendant's motion for summary judgment with respect to the Trustee's complaint in the proceeding herein is granted to the extent that the Defendant may assert the defense of Code § 547(c)(2) notwithstanding the Trustee's allegation that BFG operated a Ponzi scheme between 1990 and 1996.

---

**10.** In the Trustee's Code § 1106 report, filed December 31, 1998, the Trustee indicates that the Estate did not have the financing for new lease originations and that it was "inherently unprofitable and depended on massive fraud to stay afloaty …" when managed by the Bennetts. *See* Trustee's § 1104 Report at 34. At the same time, the Trustee also describes the lease portfolio managed postpetition as "well-seasoned and highly performing …." *See id.*