ELECTRONIC CITATION: 2013 FED App.0002P (6th Cir.)
File Name: 13b0002p.06

# BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT

In re: APPALACHIAN FUELS, LLC, *et al.*,   )
                                                   )

           Debtors.              )    No. 12-8026

_____  )

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky
No. 09-10343; 09-10373

Argued: February 12, 2013

Decided and Filed: April 19, 2013

Before: HARRIS, HUMPHREY, and PRESTON, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

**ARGUED:** Mark J. Rudolph, WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, Charleston, West Virginia, for Appellant. T. Kent Barber, DELCOTTO LAW GROUP PLLC, Lexington, Kentucky, for Trustee Appellee. Donald R. Rose, MILLER, GRIFFIN & MARKS, PSC, Lexington, Kentucky, for Committee Appellee. **ON BRIEF:** Mark J. Rudolph, WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, Charleston, West Virginia, for Appellant. T. Kent Barber, DELCOTTO LAW GROUP PLLC, Lexington, Kentucky, for Trustee Appellee. Donald R. Rose, MILLER, GRIFFIN & MARKS, PSC, Lexington, Kentucky, for Committee Appellee.

_____

## OPINION

_____

ARTHUR I. HARRIS, Bankruptcy Appellate Panel Judge. This appeal requires us to explore the complex intersection between environmental law and bankruptcy. At issue is whether the bankruptcy court abused its discretion when it denied an application for administrative expenses filed by the West Virginia Department of Environmental Protection (WVDEP) against two affiliated Chapter 11 debtors. The bankruptcy court denied WVDEP's administrative expense claims in their

entirety after addressing the threshold question of whether one or both of these affiliated debtors should be held jointly and severally liable for the reclamation obligations of a third affiliated debtor. For the reasons that follow, we AFFIRM in part and VACATE and REMAND in part for further proceedings consistent with this opinion.

## I. ISSUES ON APPEAL

Although WVDEP raises a number of issues on appeal, the only real issue before the Panel is whether the bankruptcy court abused its discretion when it denied the claims for administrative expenses of WVDEP filed against two affiliated Chapter 11 debtors.

## II. JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit (Panel) has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to the Panel, and no party has timely elected to have this appeal heard by the district court. 28 U.S.C. § 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted). An order denying an application for an administrative expense is a final order. *UMW 1974 Plan & Trust v. Lexington Coal Co.* (*In re HNRC Dissolution Co.*), 396 B.R. 461, 465 (B.A.P. 6th Cir. 2008).

An order denying an application for an administrative expense is reviewed for an abuse of discretion. *Id.* "An abuse of discretion occurs only when the [trial] court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Kaye v. Agripool, SRL* (*In re Murray, Inc.*), 392 B.R. 288 (B.A.P. 6th Cir. 2008) (citation omitted). "The question is not how the reviewing court would have ruled, but rather whether a reasonable person could agree with the bankruptcy court's decision; if reasonable persons could differ as to the issue, then there is no abuse of discretion." *Barlow v. M.J. Waterman & Assocs., Inc.* (*In re M.J. Waterman & Assocs., Inc.*), 227 F.3d 604, 608 (6th Cir. 2000).

### III. FACTS

The debtors in these jointly administered Chapter 11 liquidation cases filed for bankruptcy relief in the Eastern District of Kentucky in June and July 2009. The debtors were various entities organized in Delaware, Kentucky, and West Virginia, who conducted coal mining operations in Illinois, Kentucky, and West Virginia.

| Case Number | Debtor Name | State of Incorporation or Organization |
|---|---|---|
| 09-10343 | Appalachian Fuels, LLC (AppFuels) | Kentucky |
| 09-10372 | Appalachian Holding Co., Inc. (Appalachian Holding) | Delaware |
| 09-10373 | Appalachian Premium Fuels, LLC (AppPremFuels) | West Virginia |
| 09-10374 | Appalachian Environmental, LLC (AppEnviron) | Kentucky |
| 09-10375 | Kanawha Development Corp. (KDC) | West Virginia |
| 09-10405 | Appalachian Coal Holdings, Inc. (Appalachian Coal) | Kentucky |
| 09-10406 | Southern Eagle Energy, LLC (Southern Eagle) | West Virginia |

(collectively, Debtors). (Reply to WVDEP's Resp. to Objections to Appl. For Administrative Expense, Exhibit 1 at 13, ECF No. 2151.) The Debtors' coal mining operations included deep mining and strip mining of coal, as well as operating coal prep plants and loading facilities.

Stephen Addington served as president for all seven Debtors. All of the Debtors were subsidiaries or second-tier subsidiaries of Appalachian Holding. AppFuels and Appalachian Coal were direct subsidiaries of Appalachian Holding. AppFuels had two relevant subsidiaries, AppPremFuels and AppEnviron, and Appalachian Coal had one, KDC. AppFuels and AppPremFuels were affiliates of KDC; neither AppFuels nor AppPremFuels was a parent of KDC, and neither had an ownership interest in KDC. (*Id.*)

The bankruptcy court entered orders authorizing the joint procedural administration of the Debtors' cases in July 2009. The orders provided, "This consolidation is for administrative and procedural purposes only and shall not be construed as substantive consolidation in any respect." (ECF Nos. 155 and 227.) WVDEP filed a motion for substantive consolidation of the cases in November 2011, but it withdrew that motion, and the cases were never substantively consolidated.

The administrative expense claims at issue in this appeal arise from environmental damage at the Alloy Mining Complex in Fayette County, West Virginia. The land and the coal thereunder were subject to two leasehold agreements: (1) a lease between the Kanawha-Gauley Coal & Coke Company, as lessor, and KDC, as lessee; and (2) a lease between Penn Virginia Operating Co., LLC, as lessor, and AppFuels, as lessee. The lessors terminated both leases prior to commencement of the Debtors' bankruptcy proceedings.

WVDEP issued mining permits and National Pollutant Discharge Elimination System permits (NPDES permits) to the Debtors and their affiliated entities for use in their mining operations at the Alloy Mining Complex. KDC held three mining permits for its West Virginia operations (KDC Mining permits). These permits listed KDC as the "applicant" and "permittee," but did not identify an "operator." (Exhibit B to Reply to Appl., ECF No. 2150-2.) AppFuels held the remainder of the mining permits at issue in this appeal (AppFuels Mining permits). (Blocklist Report at 1-4, ECF No. 2067-2.) None of the parties to this appeal indicated whether the AppFuels Mining permits listed or identified any of the other Debtors as an "applicant," "operator," or "permittee." WVDEP issued one NPDES permit to KDC (KDC NPDES permit) and nineteen NPDES permits to AppFuels (AppFuels NPDES permits) for operations at the Alloy Mining Complex. (Proof of Claim 501-1 Part 4 at 15 and Part 6 at 15.) These permits carried with them the obligation to monitor and reclaim water pollution caused by discharges of wastewater from the mining facilities and to file monthly discharge monitoring reports with WVDEP.

A.      *Procedural Background*

During the pendency of their cases, the Debtors liquidated the majority of their assets in a series of sales. One of these sales concerned the assets associated with the Alloy Mining Complex.

The Debtors sought authority to sell certain mining equipment and mining permits to A.T. Massey Coal Company, specifically excluding the KDC Mining permits and associated environmental liabilities. The bankruptcy court entered an order approving the sale on September 28, 2009. Paragraph 20 of the sale order specifically provided that the Debtors were obligated to place $1,129,192 of the sale proceeds into an escrow account for the purpose of addressing the reclamation obligations associated with the KDC Mining permits. KDC did not receive any of the proceeds from this sale.

On March 21, 2011, WVDEP filed a general unsecured claim for $282,829. WVDEP filed the claim against the "Debtors, Jointly and Severally." (Proof of Claim 501-1.) Within the proof of claim, WVDEP stated that the $282,829 "finalizes the pre-petition civil penalties, fines, assessments and damages" associated with the Debtors' violations of West Virginia environmental law. (*Id.* at 2.) WVDEP further reserved its right to file applications for administrative expenses for "all post-petition violations, civil penalties, fines and damages, including remediation and reclamation costs that have been or could be incurred by the WVDEP." (*Id*. at 5.)

WVDEP attached a "Blocklist Report, Assessment Balance Summary" to its proof of claim which listed violations of West Virginia environmental law. The report detailed violations committed under the mining permits issued to KDC and AppFuels, but it did not list or otherwise identify any of the NPDES permit numbers. (Proof of Claim 501-1 Part 2.)

WVDEP also attached four consent orders issued under the West Virginia Water Pollution Control Act to its proof of claim. These consent orders were entered in early April 2009 between (1) WVDEP and AppEnviron; (2) WVDEP and AppFuels; (3) WVDEP and AppPremFuels; and (4) WVDEP and KDC. (*See* Proof of Claim 501-1 Part 3 (AppEnviron), Part 4 (AppFuels), Part 5 (AppPremFuels), and Part 6 (KDC).) The consent orders required the named permit holder to take immediate measures to comply with the terms of the NPDES permits. These requirements included filing and implementing a corrective action plan to address how the permit holder would achieve compliance with the NPDES permit limits for past violations, as well as assurances that the permit holder would remain in compliance with the monitoring requirements going forward. The orders also required the permit holder to comply with the monthly reporting requirements in the future. In

addition, the consent orders set forth civil administrative penalties against each permit holder for water pollution exceedances and failure to file monthly discharge monitoring reports. The orders also set forth stipulated penalties for any future violations of either the monitoring or reporting requirements. The permit numbers identified in these consent orders are the NPDES permit numbers, not the mining permit numbers.

In June 2011, the unsecured creditors' committee for AppFuels (AppFuels Committee) filed an adversary complaint against Stephen Addington, his brother Larry Addington, and several other individuals and entities. The AppFuels Committee sought to recover funds that were alleged to have been fraudulently transferred to the defendants and also sought to recover damages arising out of the defendants' "corporate waste, breach of fiduciary duty, unjust enrichment, and aid and abetment of other Defendants doing the same." (Compl. at 5, Adv. Case No. 11-1041, ECF No. 1.) In its complaint, the AppFuels Committee alleged that Stephen and Larry Addington and the other "insiders," "generally operated together as a single association" to reduce AppFuels to "an insolvent husk as the result of self-dealing by some of its controlling persons." (*Id.* at 5, 20.) The complaint did not identify any of the Debtors as defendants or "insiders," nor did it make any allegations concerning environmental liabilities. The only statements made regarding corporate "togetherness" consisted of sharing addresses, resources, and corporate officers. (*Id.* at 20.) The AppFuels Committee asserted that AppFuels and KDC were harmed as a result of the alleged actions of the insiders.

In August 2011, the Debtors, the AppFuels Committee, and the unsecured creditors' committee for AppPremFuels (AppPremFuels Committee) filed a joint Chapter 11 plan of liquidation and a joint disclosure statement. AppFuels and AppPremFuels were the only debtors with assets available for liquidation. (Amended Joint Plan at §§ 3.1 - 3.7, 4.1 - 4.7, ECF No. 1862.) The plan provided that the proceeds from the liquidation of AppFuels' and AppPremFuels' assets would be used, respectively, to satisfy the allowed claims of each of those debtors. Creditors of the other Debtors would not receive anything. (*Id.* at §§ 4.1, 4.2, 6.2, 6.3.) Administrative expense claims were to be filed no later than thirty days after the plan's effective date. (*Id.* at § 5.3.)

The bankruptcy court entered an agreed order confirming the joint plan of liquidation on December 19, 2011, and the plan became effective on January 3, 2012. The confirmation order specifically declined to substantively consolidate the Debtors, and the confirmed plan stopped joint administration. (Confirmation Order at ¶ 24, ECF No. 2031 ("[U]pon the Effective Date, no substantive consolidation of the Debtors shall be deemed to occur or to have occurred . . . and each Debtor shall be treated in its separate case in conformity with the terms of the Plan.").) All of the no-asset Debtors' cases were subsequently closed.

B.      *Application for Administrative Expenses*

WVDEP filed an application for administrative expenses (Application) on January 13, 2012. Pursuant to this Application, WVDEP sought allowance of an administrative expense claim against the Debtors for estimated future reclamation costs and penalties associated with the KDC Mining permits, the AppFuels Mining permits, and the NPDES permits issued to KDC and AppFuels. WVDEP asserted its rights under (1) the West Virginia Surface Coal Mining and Reclamation Act, W. Va. Code §§ 22-3-1 through 22-3-32a (WVSCMRA); (2) the West Virginia Surface Mining Reclamation Rule, W. Va. Code R. §§ 38-2-1 through 38-2-24; (3) the West Virginia Water Pollution Control Act, W. Va. Code §§ 22-11-1 through 22-11-29; and (4) the West Virginia Surface Mining/NPDES permits.

WVDEP's claim for monetary relief consisted of three parts: (1) $3,589,690 for estimated postpetition land reclamation and water remediation costs and expenses associated with the KDC Mining permits; (2) $1,099,938 in penalty assessments for violations occurring under the AppFuels Mining permits and the NPDES permits issued to KDC and AppFuels; and (3) all other costs and fees, including attorneys fees, which the bankruptcy court deemed appropriate. In the alternative, WVDEP sought injunctive relief in the form of a court order requiring the Debtors to immediately comply with all environmental obligations under West Virginia law.

In setting forth its Application, WVDEP organized its claim into two main parts. The first section discussed the Debtors' continuing obligations to perform land reclamation and water remediation under the KDC Mining permits. The second section discussed the postpetition civil

penalties assessed against the AppFuels Mining permits and the NPDES permits issued to AppFuels and KDC.

As for the ongoing environmental obligations under the KDC Mining permits, WVDEP asserted that the Debtors had a continuing duty to comply with West Virginia environmental law during the pendency of their cases pursuant to 28 U.S.C. § 959(b). For this reason, WVDEP argued that the Debtors' obligations to perform land reclamation and water remediation under West Virginia law were demands for injunctive relief, not "claims" within the meaning of 11 U.S.C. § 101(5). WVDEP also argued that the obligations were not dischargeable in bankruptcy. WVDEP further argued, however, that if the bankruptcy court were to determine "that all or part of these environmental <u>obligations</u>" were claims, the costs of complying with environmental law were postpetition claims entitled to treatment as administrative expenses. (Appl. at 3, ECF No. 2067.) Within its Application, WVDEP states that "[t]he WVDEP has been required to take over all aspects of physical on-site reclamation and remediation at the so-called three (3)" KDC sites at the Alloy Mining Complex. (*Id.*)

Turning to the environmental civil penalties assessed against the AppFuels Mining permits and the NPDES permits issued to KDC and AppFuels, WVDEP asserted that these penalties were postpetition claims that were entitled to treatment as administrative expenses. After setting forth its legal argument about why the Debtors' continuing obligations to perform land reclamation and water remediation were entitled to administrative expense treatment, WVDEP turned to the issue of whether AppFuels and AppPremFuels were jointly and severally liable for the reclamation obligations associated with KDC Mining permits. WVDEP asserted that they were. WVDEP argued there was joint and several liability because (1) AppFuels and AppPremFuels were "operators" of the KDC Mining permits; (2) the joint administration of the bankruptcy cases justified payment of the administrative expenses since "the Debtors as a whole have substantial assets"; and (3) WVDEP asserted joint and several liability in its proof of claim, and neither the Debtors nor the creditors' committees objected to the claim. (*Id.* at 13-14.)

WVDEP attached two exhibits to its Application. The first exhibit detailed the "post-petition cost estimates for all future land reclamation and water remediation for all of Debtors' remaining

West Virginia permits." (Exhibit 1, ECF No. 2067-1.) The only permits listed on this summary were the KDC Mining permits. The estimated costs listed on this summary were $1,968,882 for remediation and reclamation and $2,600,000 for the establishment of a trust for ongoing water treatment. After subtracting the bond amount of $979,172 for the KDC Mining permits, WVDEP sought a total of $3,589,690 for reclamation and remediation obligations associated with the KDC Mining permits.

The second exhibit attached to the Application consisted of (1) a Blocklist Report detailing $343,938 in environmental civil penalties which had been assessed against the AppFuels Mining permits postpetition; (2) reports detailing $63,000 in penalties for water pollution exceedances under NPDES permits issued to AppFuels and KDC; and (3) a list of $690,000 in penalties for failure of AppFuels and KDC to file postpetition monthly discharge monitoring reports for their NPDES permits. Based on the NPDES permit numbers listed in the exhibit, all of the penalties were assessed against NPDES permits issued to AppFuels and KDC. (*See* Proof of Claim 501-1 Part 4 at 5; Proof of Claim 501-1 Part 6 at 15; and Exhibit 2 to Appl. at 5-9, ECF No. 2067-2.) Additionally, although WVDEP asserted in its Application that all of the penalties in this group were postpetition, the dates for some of the violations are prepetition. (*See* Exhibit 2 at 5-8, ECF No. 2067-2.)

On February 3, 2012, the AppPremFuels Committee filed an objection to the Application in which it argued that WVDEP could not satisfy the requirements for an administrative claim against AppPremFuels' bankruptcy estate for several reasons. For example, the AppPremFuels Committee asserted that the debt at issue arose out of a transaction with KDC, not with AppPremFuels, and provided no postpetition benefit to AppPremFuels' bankruptcy estate. The AppPremFuels Committee also disputed WVDEP's allegation that the Debtors acted in concert of action, and argued that WVDEP confused joint procedural administration with substantive consolidation, pointing out that these cases were never substantively consolidated.

The liquidating trustee for AppFuels (AppFuels Liquidating Trustee) also filed an objection to the Application on February 3, 2012. The AppFuels Liquidating Trustee adopted the AppPremFuels Committee's objection as its own.

At a scheduling hearing on February 10, 2012, the bankruptcy court issued a briefing schedule for the Application and the objections. The bankruptcy court gave WVDEP fourteen days to respond to the objections. The AppFuels Liquidating Trustee and the AppPremFuels Committee had ten days to reply. Then, the bankruptcy court would "decide the matter." (Feb. 10, 2012 Tr. of Hr'g at 2, ECF No. 2223.) Pursuant to the bankruptcy court's scheduling order, the parties' supplemental briefing was "limited solely to the issue of whether the claims based on outstanding reclamation are joint liabilities of Appalachian Fuels and/or Appalachian Premium Fuels." (Feb. 13, 2012 Order, ECF No. 2120.)

WVDEP filed a response to the objections on February 24, 2012 (WVDEP response). WVDEP's response was essentially a reiteration of the argument from its Application. WVDEP attached several exhibits to its response. These exhibits included a copy of a reclamation plan for the Alloy Mining Complex and an affidavit from Jack Hagewood (Hagewood), a former regional manager for AppFuels. According to the reclamation plan, AppFuels had idled all the mines at the Alloy Mining Complex as of April 23, 2009. Since that time, AppFuels had been performing reclamation work at the site to address various environmental violations. Hagewood prepared and submitted the reclamation plan to WVDEP as "Regional Manager" for AppFuels. (*See* Alloy Complex Reclamation Plan, ECF No. 2144-1 at 2-3.) The only permits listed in the reclamation plan are two of the AppFuels Mining Permits. The reclamation plan does not indicate that AppPremFuels was involved with the reclamation work in any way.

Within his affidavit, Hagewood states the following:

3.      I worked out of the Mt. Carbon, West Virginia office and was employed until 10/16/09.

4.      In my job duties I took care of all the permitting and permit applications.

. . . .

6.      [AppPremFuels] were the operators of the underground mines.

7.      [AppFuels] was the operator of the surface mines.

8.      . . . [AppFuels] performed environmental reclamation and water treatment for all permits in West Virginia and for [AppPremFuels].

. . . .

-10-

11.     [KDC] . . . never had any assets, It only held permits with liability.

12.     All of the [Debtors] worked together as a joint venture with a common purpose, to earn money for Larry Addington.

13.     . . . [AppFuels] purchased all of the equipment, the equipment was then leased to [AppPremFuels] and/or [the other Debtors] as needed except for a few pieces of equipment being used by [AppFuels] was actually owned by a related entity Bowie Resources, Inc.; [AppFuels] paid for all the water treatment and permitting for [AppPremFuels], [KDC], and other related companies; if [KDC] needed a contractor to work on reclamation or water treatment it would be paid for by [AppFuels].

14.     All monies earned by any of the above-captioned entities and all paperwork generated was funneled through [AppFuels] at the Ashland Kentucky office.

15.     All employees regardless of where employees worked, whether that be at the [KDC] site or otherwise were paid for by [AppFuels], except employees of the underground mines were paid for by [AppPremFuels].

. . . .

17.     Larry Addington controlled all of the operations of all the entities captioned above and he directed all supervisors and employees.

(Aff. of Jack Hagewood at 1-3, ECF No. 2144-6.)

WVDEP's exhibits also included notices of assessment and demands for payment of delinquent penalties which were all addressed to AppFuels. All of the penalties and assessments related to the AppFuels Mining permits. Although the notices provided the amount of the penalties and assessments, they failed to indicate what type of violation they related to. According to these documents, the penalties and assessments against AppFuels totaled $343,381. None of the assessments or demands listed any of the NPDES permit numbers.

The exhibits also included public information obtained from the websites for the Secretary of State for Kentucky and the Secretary of State for West Virginia. These printouts listed the company and corporate information for each of the Debtors, including the officers, and indicated that Stephen Addington served as the president or manager for all the Debtors.

The AppPremFuels Committee filed a reply to WVDEP's response on March 5, 2012, in which it asserted "that all the facts and the relevant law require the [bankruptcy court] to find no such

joint and several liability for KDC's reclamation liabilities exists here." (AppPremFuels Committee Reply at 2, ECF No. 2150.) In support of its argument, the AppPremFuels Committee asserted that the only party with liability for reclamation obligations associated with the KDC Mining permits was KDC itself. Although the WVSCMRA provides that an operator or permittee is liable for reclamation obligations, the AppPremFuels Committee argued that WVDEP did not present any evidence that AppPremFuels was the owner, operator, or permittee for any of the mining operations conducted under the KDC Mining permits. In support of this, the AppPremFuels Committee argued that Hagewood's affidavit does "not state that AppPremFuels or AppFuels were the actual operators of the mines subject to the KDC [Mining] Permits." (*Id.* at 8.) If Hagewood were indeed in charge of all permit applications and permits at the Alloy Mining Complex, the Committee asserted that

> he would have been the individual responsible for indicating on the permit applications the identities of the actual operators of the permits if different from the applicant, as required by the terms of the [Surface Mining Control and Reclamation Act] and [WVSCMRA]. Yet Mr. Hagewood did not inform the [Office of Surface Mining] that any debtor other than KDC was the operator of those permits.

(*Id.* at 8-9.) Finally, the Committee stated that the Federal Clean Water Act imposes liability for violations of the act only upon the permit holder and upon the entity that controls the discharge of water at the sites. Because KDC was the only entity owning and operating the KDC Mining permits, the Committee asserted that there can be no joint and several liability for the remediation and reclamation obligations imposed on AppFuels or AppPremFuels. The AppPremFuels Committee did not address the penalties or assessments that related to (1) the AppFuels Mining permits, (2) the prepetition water pollution exceedances under the NPDES permits issued to AppFuels and KDC, or (3) AppFuels' and KDC's postpetition failure to file the monthly discharge monitoring reports for their NPDES permits.

The AppFuels Liquidating Trustee filed a response to WVDEP's Reply on March 5, 2012, through which he also argued that there was no joint and several liability in this case. The Liquidating Trustee argued that the evidence submitted by WVDEP did not demonstrate that any entity other than KDC was the owner, operator, or permittee for the mining operations conducted under the KDC Mining permits. According to the information supplied by WVDEP, the only party listed on the KDC Mining permits was KDC. The Liquidating Trustee also disputed WVDEP's

assertion that the adversary complaint filed by the Committee against non-debtor entities and individuals was an admission of joint and several liability. (AppFuels Liquidating Trustee Response at 10, ECF No. 2151.)

On June 25, 2012, the bankruptcy court entered an order overruling the Application. The bankruptcy court determined that WVDEP's arguments for joint and several liability failed as a matter of law. In so doing, the bankruptcy court concluded that the record did not support a finding that AppFuels or AppPremFuels was "liable for the reclamation obligations associated with the KDC [Mining] Permits pursuant to statute, regulation or as a result of working in concert of action." (Order Overruling Application at 10, ECF No. 2203.) In making its decision, the bankruptcy court relied on the fact that the only party identified as an applicant, permittee, or owner on the KDC Mining permits was KDC itself and "it is undisputed that the permits at issue are owned by KDC and not by any other related debtors." (Order Overruling Appl. at 10, ECF No. 2203.) The bankruptcy court also stated that the record did not demonstrate that either AppFuels or AppPremFuels had an ownership interest in KDC or "that they conducted operations under the KDC [Mining] Permits or acted in concert of action with respect to the KDC [Mining] Permits." (*Id.*)

Turning to Hagewood's affidavit, the bankruptcy court stated, "Even if the allegations set forth in the affidavit are taken as true, such are not sufficient to show the debtors acted in concert of action." (*Id.* at 11.) In so determining, the bankruptcy court reasoned that "Hagewood's affidavit contains generalities with little substantiation and is not persuasive in the analysis of whether the related debtors acted in concert of action." (*Id*.) The bankruptcy court also noted that although Hagewood's affidavit stated that AppFuels operated the surface mines and AppPremFuels operated the underground mines, Hagewood failed to identify which particular mines either entity operated. The bankruptcy court concluded that Hagewood did not allege that AppFuels or AppPremFuels was connected with the KDC Mining permits in any manner.

The bankruptcy court found WVDEP's other arguments lacked merit. For example, the bankruptcy court noted that the joint administration of the bankruptcy cases did not establish that AppFuels or AppPremFuels acted in concert of action with KDC. Because the bankruptcy court concluded that WVDEP failed to demonstrate that AppFuels or AppPremFuels was jointly and

severally liable for the reclamation obligations associated with the KDC Mining permits, it ordered that:

1. the objections to the WVDEP Application were sustained;

2. the WVDEP Application was overruled; and

3. "[a]ny claim related to the KDC [Mining] Permits, or any other obligation of KDC, is deemed **DISALLOWED** as to the App Fuels Committee, the App Fuels Creditors Trust, the AppPremFuels Committee and the AppPremFuels Fund."

(Order Overruling Appl. at 12, ECF No. 2203.) In so ruling, the bankruptcy court did not address WVDEP's Application as it related to the penalties assessed for violations under AppFuels Mining permits, AppFuels NPDES permits, or KDC NPDES permits.

WVDEP's timely appeal followed.

## IV. DISCUSSION

Section 503(b) of the Bankruptcy Code provides that "administrative expenses" include "the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b). The Sixth Circuit has explicitly found that environmental costs which are recoverable under state or federal law may be entitled to administrative expense priority. *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 123 (6th Cir. 1987) (concluding that state could seek recovery of response costs under CERCLA as an administrative expense under § 503(b)). In addition, even penalties for postpetition environmental violations may be administrative expense claims under § 503(b). *See United States v. Noland*, 517 U.S. 535, 116 S. Ct. 1524 (1996) (bankruptcy court cannot subordinate penalties entitled to administrative expense priority merely because they are penalties). The applicant has the burden of proof in seeking allowance of an administrative claim and he must satisfy that burden by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654 (1991) (preponderance-of-the-evidence standard presumed to be applicable in civil actions between private parties); *In re HNRC Dissolution Co.*, 343 B.R. 839, 842-43 (Bankr. E.D. Ky. 2006).

In addressing WVDEP's administrative expense claims in this case, the bankruptcy court made it clear that it would first address a threshold issue – whether one or both of these affiliated debtors should be held jointly and severally liable for the reclamation obligations of a third affiliated debtor. In fact, the bankruptcy court indicated that it would not entertain argument on any other issues until it decided this threshold question. Thus, the bankruptcy court excluded from its initial determination a number of secondary issues, such as (1) whether the environmental claims are properly administrative expense claims as opposed to prepetition claims; (2) the amount of such claims; and (3) whether any of the administrative expense claims are owed directly by AppFuels or AppPremFuels for other environmental obligations unrelated to the reclamation obligations of KDC. Unfortunately, while the parties disagreed strongly about the merits of WVDEP's administrative expense claims and raised numerous arguments before the bankruptcy court in favor of their respective positions, none of the parties properly focused on the elements needed to establish AppFuels' and AppPremFuels' liability for the reclamation obligations associated with the permits owned by their affiliate KDC.

## A. _Derivative Versus Direct Environmental Liability_

Although WVDEP argued before the bankruptcy court that AppFuels and AppPremFuels must be held jointly and severally liable for reclamation obligations of a third affiliated debtor, the parties failed to distinguish between derivative and direct liability for the reclamation obligations of KDC. In order to properly analyze the administrative expense claims at issue in this appeal, the Panel must first differentiate between derivative and direct liability.

### 1. _United States v. Bestfoods_

The Supreme Court's decision in _United States v. Bestfoods_, 524 U.S. 51, 55, 118 S. Ct. 1876 (1998), is instructive on the issue of derivative versus direct liability. _Bestfoods_ involved an action brought by the United States under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) against various entities for the costs of cleaning up industrial waste generated by a chemical plant in Michigan. The trial focused on whether a parent corporation had "owned or operated" the plant within the meaning of CERCLA. The trial court held that the parent

corporation could be held liable. On appeal, the Sixth Circuit adopted a stricter standard for imposition of liability and reversed. On further appeal, the Supreme Court, in a unanimous ruling by Justice Souter, made a point of distinguishing between derivative liability and direct liability.

As for derivative liability, the Supreme Court held that a parent corporation may be charged with derivative CERCLA liability for its subsidiary's actions in operating a polluting facility "[w]hen (but only when) the corporate veil may be pierced." *Id.* at 63.

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. . . . [N]othing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible. The Government has indeed made no claim that a corporate parent is liable as an owner or an operator under § 107 simply because its subsidiary is subject to liability for owning or operating a polluting facility.

> But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia,* the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf. Nothing in CERCLA purports to rewrite this well-settled rule, either.

*Id.* at 61-63 (internal citations omitted). Since no one asserted that the corporate veil should be pierced in *Bestfoods*, the Supreme Court did not delve further into the issue of derivative liability. For example, the Supreme Court left open the question of whether, in enforcing CERCLA's derivative liability, "courts should borrow state law, or instead apply a federal common law of veil piercing." *Id.* at 63 n.9.

As for direct liability, the Supreme Court noted that "CERCLA liability may turn on operation as well as ownership, and nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary." *Id.* at 64.

> In such instances, the parent is directly liable for its own actions. . . . The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent "corporation is [itself] responsible for the wrongs committed by its agents in the course of its business," *Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 395, 42 S. Ct. 570, 577, 66 L. Ed. 975 (1922),

and whereas the rules of veil piercing limit derivative liability for the actions of another corporation, CERCLA's "operator" provision is concerned primarily with direct liability for one's own actions.

*Id.* at 65 (citation omitted).

After ruing the uselessness of CERCLA's definition of a facility's "operator" as "any person . . . operating" the facility, 42 U.S.C. § 9601(20)(A)(ii), the Supreme Court attempted to give the word "operator" its ordinary meaning.

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66-67.

The Supreme Court then noted that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Id.* at 69. In addition, it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Id.* at 69 (citing *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)). " '[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.' " *Id.* at 72 (citation omitted). On the other hand:

> [A] parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture. . . . [Furthermore,] a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility. See n. 13, *supra*. Yet another possibility, suggested by the facts of this case, is that an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.

*Id.* at 71.

After explaining its standard for direct liability, the Supreme Court noted that there were enough facts in the case before it to raise an issue of the parent's operations of the facility, but declined to draw any ultimate conclusions.

> Not only would we be deciding in the first instance an issue on which the trial and appellate courts did not focus, but the very fact that the District Court did not see the case as we do suggests that there may be still more to be known about [a parent employee's] activities. Indeed, even as the factual findings stand, the trial court offered little in the way of concrete detail for its conclusions about [his] role in [the subsidiary's] environmental affairs, and the parties vigorously dispute the extent of [his] involvement. Prudence thus counsels us to remand, on the theory of direct operation set out here, for reevaluation of [the parent employee's] role, and of the role of any other [agent of the parent] who might be said to have had a part in operating the Muskegon facility.

*Id.* at 72-73 (footnote omitted).

While *Bestfoods* involved liability under CERCLA, its analysis of derivative and direct liability provides a useful framework in analyzing AppFuels' and AppPremFuels' liability for administrative expense claims under the environmental statutes at issue here. Accordingly, the Panel will first review the bankruptcy court's determination based on the theory of AppFuels' and AppPremFuels' derivative liability for the debts of the their affiliate, KDC. Next the Panel will review the bankruptcy court's determination based on the theory of AppFuels' and AppPremFuels' direct liability for the reclamation obligations associated with the permits owned by their affiliate, KDC.

### 2. *Derivative Liability*

As indicated previously, the Supreme Court held in *Bestfoods* that a parent corporation may be charged with derivative liability for its subsidiary's actions in operating a polluting facility "[w]hen (but only when) the corporate veil may be pierced." *Id.* at 63. Thus, if WVDEP is to establish AppFuels' and AppPremFuels' derivative liability for the environmental debts of their affiliate KDC, it must prove the elements needed to pierce the corporate veil between AppFuels and

AppPremFuels and KDC. Moreover, unlike the typical veil-piercing situation, the relationship between AppFuels and AppPremFuels and KDC is not that of a parent and its subsidiary, but rather that of affiliates, as neither AppFuels nor AppPremFuels has any ownership interest in KDC.

In *Bestfoods*, the Supreme Court left open the question of whether, in enforcing CERCLA's derivative liability, courts should borrow state law or instead apply a federal common law of veil piercing. *Bestfoods*, 524 U.S. at 63 n.9. The Sixth Circuit Court of Appeals, however, has held that courts should borrow state law, *Carter-Jones Lumber Co. v. Dixie Dist. Co.*, 166 F.3d 840, 846-48 (6th Cir. 1999), and the Panel sees no reason why the same analysis should not apply to derivative liability under the environmental statutes here.

Having that maxim as our guide, the next question we must ask is which state's derivative liability law do we apply in this appeal? Here we have three affiliates who filed bankruptcy cases in Kentucky. KDC was incorporated in West Virginia; AppFuels is a Kentucky limited liability company; and AppPremFuels is a West Virginia limited liability company. (Reply to WVDEP's Resp. to Objections to Appl. For Administrative Expense, Exhibit 1, at 13, Bankr. Case No. 09-10343, ECF No. 2151.) The mining operations which caused the environmental damage took place in West Virginia. (App. at 4, 6, Bankr. Case No. 09-10343, ECF Nos. 2067.) This leaves as potential options the derivative liability laws of West Virginia and Kentucky.

"An initial task of a choice-of-law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). As explained more fully below, the administrative expense claims against AppFuels and AppPremFuels were properly denied to the extent they were based on derivative liability for the debts of KDC under either West Virginia or Kentucky law. Therefore, the Panel need not engage in a more complicated choice of law analysis. *Compare*, *e.g.*, *Howell Contractors, Inc., v. Berling*, 383 S.W.3d 465, 467 (Ky. Ct. App. 2012) (courts should look to the law of the state in which the entity for which derivative liability is sought was incorporated, citing Restatement (Second) Conflict of Laws § 307 (1971)), *with Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997) (Restatement does not mandate using law of state of incorporation

if another state "has a far more significant relationship to the events in question than does the state of incorporation").

a. *Derivative Liability under West Virginia and Kentucky Law*

Two leading West Virginia cases on the issue of derivative liability are *Southern Electrical Supply Co. v. Raleigh County National Bank*, 320 S.E.2d 515 (W. Va. 1984), and *Laya v. Erin Homes, Inc.*, 352 S.E.2d 93 (W. Va. 1986).

In *Southern Electrical*, the West Virginia Supreme Court of Appeals recognized generally that piercing the corporate veil is a doctrine that is "designed to prevent injustice when the corporate form is interposed to perpetrate an intentional wrong, fraud or illegality". *Id.* at 521-22 (footnotes omitted). The *Southern Electrical* court further explained the doctrine as follows:

> Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong. However, the corporate form will never be disregarded lightly. The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure. Nor is mutuality of interest, without the countermingling of funds or property interests, or prejudice to creditors, sufficient. Rather it must be shown that the corporation is so organized and controlled as to be a mere adjunct or instrumentality of the other.
>
> . . . .
>
> A corporate shield may, of course, be "pierced" to subject a sole shareholder to liability for corporate acts or to make a corporation liable for behavior of another corporation within its total control. But decisions to look beyond, inside and through corporate facades must be made case-by-case, with particular attention to factual details.
>
> Decisions to "pierce" involve multifarious considerations, including inadequacy of capital structures, whether personal and corporate funds have been commingled without regard to corporate form by a sole shareholder, whether two corporations have commingled their funds so that their accounts are interchangeable; whether they have failed to follow corporate formalities, siphoning funds from one corporation to another without regard to harm caused either entity, or failed to keep separate records. Other reasons to disregard the structure are: *total* control and dominance of one corporation by another or a shareholder; existence of a dummy corporation with no business activity or purpose; violation of law or public policy;

a unity of interest and ownership that causes one party or entity to be indistinguishable from another; common shareholders, common officers and employees, and common facilities.

       This evidence must be analyzed in conjunction with evidence that a corporation attempted to use its corporate structure to perpetrate a fraud or do grave injustice on an innocent third party seeking to "pierce the veil."

*Id.* at 522-23 (footnotes and citations omitted). Because West Virginia law provides for the formation of closely held corporations, the *Southern Electrical* court concluded that it could not "disregard a corporation solely because it has one or two, and the same, shareholders. Nothing in our law prohibits one man or group from starting or owning two separate corporations with common purposes." *Id.* at 524. The party seeking to impose derivative liability has the burden of proving that the corporate veil should be pierced. *Id.* at 522.

The West Virginia Supreme Court of Appeals revisited the issue of derivative liability in the case of *Laya v. Erin Homes, Inc.*, 352 S.E.2d 93 (W. Va. 1986). Echoing its conclusions in *Southern Electrical,* the *Laya* court noted that "piercing the corporate veil" is an equitable remedy which courts must impose on an *ad hoc* basis after closely examining the facts of the case under a totality of the circumstances approach. *Id.* at 98 (citation omitted). In so doing, a court should employ a two part test. First, a court must examine a number of factors, including those catalogued in *Southern Electrical*. *Laya*, 352 S.E.2d at 98-99. Second, a court must analyze these factors "in conjunction with evidence that a corporation attempted to use its corporate structure to perpetrate a fraud or do grave injustice on an innocent third party seeking to 'pierce the veil.' " *Id.* at 99 (citing *S. Elec.*, 320 S.E.2d at 523).

Ordinarily, parties seek to pierce the corporate veil to impose liability on a parent corporation or an individual shareholder. In the case currently on appeal, neither AppFuels nor AppPremFuels is KDC's parent corporation, nor does either entity hold an ownership interest in KDC. KDC's relationship to AppFuels and AppPremFuels is one of affiliated or sister corporations. In a footnote in *Southern Electrical*, the West Virginia Supreme Court of Appeals recognized that "separate entities of two affiliated corporations owned by the same party or parent corporation may be disregarded if the other prerequisites are met." *S. Elec.*, 320 S.E.2d at 524 n.18 (citations omitted). Thus, West Virginia law is more favorable to parties seeking to establish AppFuels' and

AppPremFuels' derivative liability for the debts of KDC than the law of states such as Kentucky where there is no reported decision that recognizes the ability to pierce the corporate veil of one corporation to reach its sister corporation, or the law of states such as Ohio where the highest state court has expressly rejected such liability. *See Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613 (Ohio 2009).

The requirements for piercing the corporate veil under Kentucky law are similar to those under West Virginia law, other than the absence of Kentucky case law recognizing the ability to pierce the corporate veil of one corporation to reach its sister corporation. In *Inter-Tel Techologies, Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152 (Ky. 2012), the Kentucky Supreme Court addressed derivative liability under Kentucky law. Like West Virginia, Kentucky uses a two-part test to determine whether the corporate veil should be pierced in order to impose liability upon the shareholders of a corporation or upon a parent corporation. A party seeking to impose derivative liability on a parent corporation must demonstrate that (1) there was "domination of the corporation resulting in a loss of corporate separateness and (2) [there were] circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Id.* at 165.

b.       *Application of West Virginia and Kentucky Law*

Although the bankruptcy court did not analyze AppFuels' or AppPremFuels' derivative liability under a theory of state-law veil piercing, our review of the record indicates that the bankruptcy court did not abuse its discretion to the extent that its order resulted in the denial of WVDEP's administrative expense claims under this theory. The evidence in the record is simply insufficient to pierce the corporate veil of KDC and impose derivative liability on AppFuels or AppPremFuels for KDC's reclamation obligations. This is true whether one applies West Virginia or Kentucky law because under the veil-piercing law of either state WVDEP failed to demonstrate that there were enough factors to justify piercing KDC's corporate veil. WVDEP did not present any proof as to whether funds or property interests were commingled. There is no evidence of inadequate capital structures, failure to follow corporate formalities, siphoning off of KDC funds to the other entities, or total control and dominance of KDC by the other entities. Aside from indicating that Stephen Addington served as director or president of the three entities, WVDEP did not present any evidence that KDC, AppFuels, and AppPremFuels had the same directors and

officers or that the similar officers shared responsibility for supervision and management of KDC's mining operations. There was also no evidence presented that KDC intended to use its corporate structure as a way to perpetrate a fraud or do grave injustice to a third party. In fact, WVDEP seems to concede that the theory it proffered before the bankruptcy court for joint and several liability had a significantly lower level of proof than that required to establish corporate veil piercing under state law. (*See* Reply Br. at 20-21 ("The [AppFuels Committee's Adversary] Complaint was far greater in scope than WVDEP's Application for Administrative Expenses. . . . [The Complaint] essentially asserts a 'vertical' corporate veil piercing claim. Meanwhile, WVDEP's Application for Administrative Expenses simply contain[s] a 'horizontal' concert of action with a common design/joint and several liability assertion, something that is much easier to prove than corporate veil piercing.")). As a result, WVDEP's administrative expense claims against both AppFuels and AppPremFuels were properly denied to the extent the claims were based on the theory of AppFuels' and AppPremFuels' derivative liability for the debts of their affiliate, KDC, as a result of veil piercing under state law.

c.      *Substantive Consolidation*

Another form of liability unique to bankruptcy is substantive consolidation. In *First National Bank of Barnesville v. Rafoth* (*In re Baker & Getty Financial Services, Inc.*), 974 F.2d 712 (6th Cir. 1992), the Sixth Circuit explained:

> Substantive consolidation is employed in cases where the interrelationships of the debtors are hopelessly obscured and the time and expense necessary to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all of the creditors. In any consolidated case, there is implicit in the Court's decision to consolidate the conclusion that the practical necessity of consolidation to protect the possible realization of any recovery for the majority of the unsecured creditors far outweighs the prospective harm to any particular creditor.
>
> Thus, when a case is substantively consolidated, the Order for consolidation is, in effect, a determination by the Court that consolidation is warranted by the circumstances of the cases and that it is in the best interest of unsecured creditors to join the assets and liabilities of two debtors. It is, in effect, a statement by the Court that the assets and liabilities of one debtor are substantially the same assets and liabilities of the second debtor.

*Id.* at 720 (6th Cir. 1992) (quoting *Evans Temple Church of God in Christ & Community Ctr., Inc. v. Carnegie Body Co.* (*In re Evans Temple Church of God in Christ & Community Ctr., Inc.*), 55 B.R. 976, 981-82 (Bankr. N.D. Ohio 1986)).  *See also In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) (explaining history of substantive consolidation).  Substantive consolidation

> treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.

*Owens Corning*, 419 F.3d at 205.

Despite WVDEP's arguments to the contrary, joint procedural administration of bankruptcy cases does not result in the same melding of the estates as substantive consolidation.  The joint procedural administration of cases is nothing more than

> a procedural tool permitting use of a single docket for administrative matters, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other ministerial matters that may aid in expediting the cases.  Used as a matter of convenience and cost saving, it does not create substantive rights.  By contrast, substantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantial rights.

*Reider v. Fed. Deposit Ins. Corp.* (*In re Reider*), 31 F.3d 1102, 1109 (11th Cir. 1994) (internal citations omitted) (internal quotation marks omitted); *In re Houghton Mifflin Harcourt Publishing Co.*, 474 B.R. 122, 130 n.26 (Bankr. S.D.N.Y. 2012).  In no way does joint procedural administration "merge[] the assets and liabilities of the debtor entities into a unitary debtor estate, to which all holders of allowed claims are required to look for distribution."  *Woburn Assoc. v. Kahn* (*In re Hemingway Transport, Inc.*), 954 F.2d 1, 11-12 (1st Cir. 1992) (citations omitted).  "Administrative expenses incurred in each jointly administered debtor's bankruptcy estate are not treated as a joint debt."  *In re Las Torres Development, L.L.C.*, 413 B.R. 687, 698 (Bankr. S.D.Tex. 2009).

Accordingly, substantive consolidation has no application in this appeal.  While it is true that WVDEP initially sought to substantively consolidate the Debtors' bankruptcy cases, WVDEP withdrew that motion and abandoned its attempt to so consolidate the estates.  Moreover, the

Debtors' joint plan and the order confirming that plan expressly rejected substantive consolidation and maintained the separateness of the assets of each of the Debtors. Therefore, the only potential liability remaining for administrative expense claims in this appeal is based on the theory of AppFuels' and AppPremFuels' direct liability for the environmental obligations at issue.

3.    *Direct Liability*

As previously noted, WVDEP's administrative expense claims against both AppFuels and AppPremFuels were properly denied to the extent the claims were based on the theory of the Debtors' derivative liability for the debts of KDC, either as a result of veil piercing under state law or substantive consolidation under federal common law. What remains to be determined, however, is whether the bankruptcy court abused its discretion when it denied WVDEP's administrative expense claims against AppFuels and AppPremFuels to the extent the claims were based on the theory of these Debtors' direct liability for the reclamation obligations associated with the permits owned by their affiliate, KDC.

> *Bestfoods* instructs that under at least one environmental statute, CERCLA,
>
> a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture . . . [or when] an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.

*Bestfoods,* 524 U.S. at 71 (citation omitted). Whether AppFuels or AppPremFuels can be held directly liable depends on the evidence in the record and the language of the specific environmental statutes at issue here — the Surface Mining Control and Reclamation Act; the West Virginia Surface Coal Mining and Reclamation Act; the Federal Water Pollution Control Act Amendments of 1972, commonly referred to as the Clean Water Act; and the West Virginia Water Pollution Control Act.

a.    *Surface Mining Control and Reclamation Act & West Virginia Surface Coal Mining and Reclamation Act*

The Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 *et seq.*, was enacted by Congress in 1977 to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations" and to "assure that surface

coal mining operations are so conducted as to protect the environment." 30 U.S.C. § 1202(a) & (d). "In general, reclamation under the SMCRA requires the surface of land be restored to its approximate original contour and water polluted by the mining operation be properly treated before leaving the mining site." *Cat Run Coal Co. v. Babbitt*, 932 F. Supp. 772, 774 n.3 (S.D. W. Va. 1996) (citations omitted).

The SMCRA requires any party wishing to engage in surface coal mining activities to obtain a surface coal mining permit. 30 U.S.C. §§ 1256, 1257. The permit application must contain the names and addresses of the applicant and the operator of the mining operation "if he is a person different from the applicant." 30 U.S.C. § 1257(b)(1). The SMCRA defines "operator" as "any person, partnership, or corporation engaged in coal mining . . . ." 30 U.S.C. § 1291(13).

Before a permit application can be approved, the applicant is required to obtain a performance bond to cover the costs of any necessary reclamation. 30 U.S.C. § 1259(a). If the applicant or operator is unable to cover the costs of reclamation after default, 30 C.F.R. § 800.50 provides that "any and all bonds deposited to complete reclamation" will be forfeited. If the forfeited amount of the bond is insufficient to cover the total costs of reclamation, the operator and permittees are liable for any shortfall. 30 C.F.R. § 800.50(d)(1); *Cat Run Coal Co.*, 932 F. Supp. at 780.

Pursuant to § 1253 of the SMCRA, a state may assume primary jurisdiction for regulation and enforcement of surface coal mining operations and reclamation obligations occurring on non-federal lands within its borders. 30 U.S.C. § 1253(a). The state's "program need not be identical to the federal program, as long as its provisions are at least as stringent as those provided for in the federal act." *Canestraro v. Faerber,* 374 S.E.2d 319, 320 (W. Va. 1988).

The Office of Surface Mining Reclamation and Enforcement (OSM) approved West Virginia's program to regulate the surface mining activities within its borders in 1981. Accordingly, West Virginia enacted the West Virginia Surface Coal Mining and Reclamation Act, W. Va. Code § 22-3-1 *et seq.* "The [WVSCMRA] sets out minimum performance standards that mirror those found in SMCRA, and the [Director of WVDEP] has exercised his statutorily granted power to promulgate State regulations that parallel those issued by the Secretary of the Interior pursuant to the

federal [SMCRA]." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 289 (4th Cir. 2001) (citing W. Va. Code R. § 38-2-1 *et seq.*). As recognized by the Fourth Circuit Court of Appeals in *Bragg*, the regulation of coal mining on non-federal lands within West Virginia's borders is, with certain exceptions, governed exclusively by the WVSCMRA, subject only to federal approval and oversight. *Id.*

Like the SMCRA, the WVSCMRA requires entities wishing to engage in surface coal mining to submit an application for a mining permit to WVDEP. W. Va. Code § 22-3-9. The applicant is required to include "(1) The names and addresses of: (A) The permit applicant; . . . [and] (E) the operator, if different from the applicant . . . ." W. Va. Code § 22-3-9(a)(1). The applicant is also required to submit a reclamation plan with its application and to post a performance bond to cover the cost of any future reclamation. W. Va. Code §§ 22-3-10 & 22-3-11. Pursuant to the WVSCMRA regulations, "[t]he operator or permittee" is liable for the any costs of reclamation over the amount of the forfeited bond. W. Va. Code R. § 38-2-12.4.d & e.

Although the WVSCMRA provides the primary framework for regulation of surface mining on non-federal lands within West Virginia's borders, the SMCRA still provides the blueprint for West Virginia's law. *See Bragg*, 248 F.3d at 289. Nowhere is this more visible than in the WVSCMRA's definition of "operator." The WVSCMRA explicitly states that the term "operator"

> means any person who is granted or who should obtain a permit to engage in any activity covered by this article and any rule promulgated under this article and includes any person who engages in surface mining or surface mining and reclamation operations, or both. The term *shall also be construed in a manner consistent with the federal program pursuant to the federal Surface Mining Control and Reclamation Act of 1977, as amended*.

W. Va. Code § 22-3-3(o) (emphasis added). The West Virginia Code of State Rules defines the term similarly:

> Operator means any person who is granted or who should obtain a permit to engage in any activity covered by the Act or this rule, or anyone who engages in surface mining and/or surface mining and reclamation operations. Further, the term *shall be construed in a manner consistent with the* [*SMCRA*] pursuant to Public Law 95-87.

W. Va. Code R. § 38-2-2.82 (emphasis added).

The concept of joint and several liability under both the SMCRA and the WVSCMRA is not distinct from direct liability. Rather, it is an expansion of direct liability to more than one entity. In the case of *P.B. Dirtmovers, Inc. v. United States*, 30 Fed. Cl. 474 (Fed. Cl. 1994), the Court of Federal Claims elaborated on the concept of joint and several liability under the SMCRA:

> The Department of the Interior has consistently interpreted "operator" to include both mining contractors and mine land owners. *United States v. Manning Coal Corp.*, 977 F.2d 117, 121 (4th Cir.1992); see also 46 Fed. Reg. 60780 (Dec. 11, 1981); 42 Fed. Reg. 62713 (Dec. 13, 1977). Consistent with this policy and with congressional intent, the Department has declared mining contractors and landowners to be jointly and severally liable for reclamation fees. *Manning*, 977 F.2d at 121; 49 Fed. Reg. 31412 (Aug. 7, 1984) ("OSM will continue to pursue a policy of joint and several liability").

> The policy of joint and several liability is consistent with the language and purpose of SMCRA. *See, e.g., Manning,* 977 F.2d at 121.

*P.B. Dirtmovers*, 30 Fed. Cl. at 477-78; *see also SG Coal Co., Inc. v. Lujan*, 808 F. Supp. 1258, 1262 (W.D. Va. 1992); *United States v. Spring Ridge Coal Co.*, 793 F. Supp. 124, 128-29 (N.D. W. Va. 1992). As recognized by the court in *United States v. Manning Coal Corp.*, 977 F.2d 117 (4th Cir. 1992):

> The essence of joint and several liability is that a creditor, including the government, may sue one or more of the parties to such liability separately, or all of them together at his option. We believe, therefore, that the SMCRA allows the Department of the Interior to pursue the mineral owner and the mining contractor in separate lawsuits.

*Id.* at 122 (internal citations omitted) (internal quotation marks omitted).

        b.        *Application of Surface Mining Control and Reclamation Act &West Virginia Surface Coal Mining and Reclamation Act*

In the case currently on appeal, the bankruptcy court determined that neither AppFuels nor AppPremFuels had any direct liability for the reclamation obligations associated with the KDC Mining permits as a matter of law. In so doing, the bankruptcy court stated that "[e]ven if the allegations set forth in the [Hagewood] affidavit are taken as true, such are not sufficient to show that the debtors acted in concert of action." (Order Overruling Appl. at 11, ECF No. 2203.) Whether the Debtors "acted in concert of action" is irrelevant to determining whether AppFuels or AppPremFuels is jointly and severally liable as an "operator" for the same reclamation obligations for which KDC

is liable as "owner" of the permits. What is relevant is whether the evidence in the record established that AppFuels or AppPremFuels might have operated the coal mining activities under the KDC Mining permits within the meaning of the SMCRA and the WVSCMRA.

In their appellate briefs, the parties spend considerable time arguing about the manner in which the bankruptcy court heard the threshold question of whether AppFuels and AppPremFuels should be jointly and severally liable for the reclamation obligations associated with the KDC permits. For example, WVDEP insists that it should have been given an opportunity to present additional evidence, and AppFuels and AppPremFuels insist that WVDEP consented to the bankruptcy court's scheduling order which did not provide for an evidentiary hearing. Nevertheless, the Panel understands the bankruptcy court's actions as addressing the threshold question of whether WVDEP's arguments for joint and several liability failed as a matter of law. If the bankruptcy court determined that there was sufficient evidence in the record to show that AppFuels and AppPremFuels could be jointly and severally liable for the reclamation obligations associated with the KDC permits, then the administrative expense claims would be the subject of further proceedings. If not, then the claims associated with the KDC permits would be denied in their entirety. In essence, nothing else would be decided until the bankruptcy court could determine whether WVDEP's arguments for joint and several liability failed as a matter of law – *i.e.*, as if the bankruptcy court were deciding a motion for summary judgment.

The bankruptcy court's "summary judgment" approach is evident from the language in the bankruptcy court's decision "tak[ing] as true" the allegations set forth in the Hagewood affidavit and finding that WVDEP's arguments for joint and several liability "fail as a matter of law." (*Id.* at 9, 11. *See also* App Fuels Creditors Trust Br. at 24 (noting that bankruptcy court construed the Hagewood affidavit in light most favorable to WVDEP).) In addition, it makes little sense to resolve factual disputes and weigh credibility through competing affidavits. If the allegations disputed by AppFuels and AppPremFuels, taken as true, would establish joint and several liability, then it is typically incumbent on the bankruptcy court to resolve those disputes through an evidentiary hearing. *See Brock v. Hammonds* (*In re Triton Enterprises, Inc.*, No. 10-8049), 464 B.R. 62, 2011 WL 2646549, at *3 n.1 (B.A.P. 6th Cir. July 7, 2011) (unpublished table decision) (criticizing procedure

under which proponent of each witness submitted an affidavit of the witness in lieu of direct testimony, and then the opposing party cross examined the witness).

Considering the evidence in a light most favorable to WVDEP, we conclude that there is a genuine issue of material fact as to whether AppFuels performed coal mining and reclamation operations under the KDC Mining permits and is thus liable for the reclamation obligations. In his affidavit, Hagewood stated that AppFuels operated all of the surface mines at the Alloy Mining Complex. He also stated that AppFuels "performed environmental reclamation and water treatment for *all permits* in West Virginia . . . ." (Aff. of Jack Hagewood at 2, ECF No. 2144-6 (emphasis added).) Hagewood also asserted that AppFuels owned almost all of the equipment being used at the Alloy Mining Complex. Furthermore, the reclamation plan Hagewood submitted to WVDEP makes clear that AppFuels was performing some, if not all, of the reclamation work at the Alloy Mining Complex as of at least April 2009. The fact that the mines at that complex had been idled at the time reclamation work was being done is of no importance. As long as reclamation work is still going on, a party can remain liable as an "operator" even if the actual mining operations have stopped. *See Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1094 (6th Cir. 1981). Nor is the absence of AppFuels on the KDC permit applications or permits themselves dispositive. If it were, operator liability could be easily thwarted.

In addition, a review of the evidence indicates that AppFuels may have had an "economic interest" in KDC's mining operations at the Alloy Mining Complex. According to Hagewood's affidavit, AppFuels owned all of the equipment at the complex and paid for all reclamation and remediation for the West Virginia permits. Hagewood also stated that AppFuels paid all of the surface mine employees at the complex. Thus, the record indicates that AppFuels may have been an "operator" of the KDC Mining permits within the meaning of the SMCRA and the WVSCMRA. *See United States v. Rapoca Energy Co.*, 613 F. Supp. 1161, 1165 (W.D. Va. 1985) (citing *Parsons v. Smith*, 359 U.S. 215, 225, 79 S. Ct. 656, 663 (1959)) (setting forth factors to determine whether a company holds an economic interest for the purpose of determining liability for reclamation).

Accordingly, we hold that the bankruptcy court abused its discretion when it denied WVDEP's administrative expense claims against AppFuels to the extent the claims were based on

the theory of AppFuels' direct liability for the reclamation obligations associated with the permits owned by AppFuels' affiliate, KDC, under the SMCRA and the WVSCMRA. Having thus ruled, however, we do not intend for our conclusions to imply that the record, either in the bankruptcy court or on appeal, definitively establishes that AppFuels was an operator of the KDC Mining permits within the meaning of the SMCRA and the WVSCMRA. As the Supreme Court recognized in *Bestfoods*, resolution of this factual matter is a task best left to the bankruptcy court. *Bestfoods*, 524 U.S. at 72-73.

Turning our attention to AppPremFuels, we conclude that the bankruptcy court did not abuse its discretion when it denied WVDEP's direct liability administrative expense claims against AppPremFuels under the SMCRA and the WVSCMRA. The evidence in the record, even when viewed most favorably toward WVDEP, did not demonstrate that AppPremFuels was an "operator" of the KDC Mining permits. Hagewood stated in his affidavit that the only entity operating the surface mines was AppFuels and that AppPremFuels' involvement with the Alloy Mining Complex was limited to operation of underground mines. In addition, the reclamation plan makes no mention of AppPremFuels performing any of the reclamation work at the Alloy Mining Complex. There simply were no factual allegations that AppPremFuels either operated or reclaimed any of the West Virginia surface mines. Consequently, to the extent that the bankruptcy court determined that AppPremFuels had no joint and several liability for the reclamation obligations associated with the KDC Mining permits under the SMCRA and the WVSCMRA, that portion of the bankruptcy court's ruling is affirmed.

### c. Clean Water Act & West Virginia Water Pollution Control Act

The Water Pollution Prevention and Control Act of 1972, commonly referred to as the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, "prohibits, among other things, 'the discharge of any pollutant by any person,' . . . without a permit, into the 'navigable waters,' . . . —which the Act defines as 'the waters of the United States.' " *Sackett v. EPA*, 132 S. Ct. 1367, 1369-70 (2012) (citing 33 U.S.C. §§ 1311, 1344, 1362(7)). The Clean Water Act provides for the issuance of permits that allow the discharge of certain pollutants into federal waters. 33 U.S.C. § 1342. "Any person who discharges or proposes to discharge pollutants" is required to obtain an NPDES permit. 40 C.F.R. § 122.21(a).

Under the Clean Water Act, states may "issue [NPDES] permits for discharges into the navigable waters within the jurisdiction of each state" and may administer permitting programs which govern the issuance and enforcement of point source discharges into non-federal waters. 33 U.S.C. § 1342(a)(5) & (b); 40 C.F.R. § 123.25. The Clean Water Act defines the term "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362 (14). Once the EPA approves the state program, the state law becomes the primary mechanism for oversight of water pollution laws and regulations in state waters. 33 U.S.C. § 1342(c)(1). Unlike the SMCRA, however, "[u]nder the [Clean Water Act], state regulations are incorporated 'into the unitary federal enforcement scheme,' with federal provisions remaining in effect." *Ohio Valley Envtl Coal., Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886, 902 (S.D. W. Va. 2010) (quoting *Bragg*, 248 F.3d at 294). What results is a "system of 'cooperative federalism' " in which the state statutes operate along side the federal ones. *S. Ohio Coal Co. v. Office of Surface Mining, Reclamation & Enforcement*, 20 F.3d 1418, 1427 (6th Cir. 1994) (citing 33 U.S.C. § 1342).

West Virginia obtained approval of its NPDES permit program, commonly referred to as the West Virginia Water Pollution Control Act (WVWPCA), in May 1982. 47 Fed. Reg. 22,363 (May 24, 1982). The WVWPCA is set forth at West Virginia Code § 22-11-1 *et seq.*, and West Virginia Code of State Rules § 47-10-1 *et seq.* WVDEP is tasked with overseeing the WVWPCA. W. Va. Code § 22-11-4. "Any person who violates any provision of any permit issued" pursuant to the WVWPCA is liable for penalties. W. Va. Code § 22-11-22.

The Clean Water Act defines "person" as "an individual, corporation, partnership, association, State, municipality, commission or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). There is no mention of an "owner" or "operator" in the Clean Water Act's definition. Although the Clean Water Act's definition of "person" does not specifically reference "owner" or "operator," other sections of the Clean Water Act do specifically make reference to such entities. Section 1318(a) of the Clean Water Act states that the EPA Administrator may "require the owner or operator of any point source" to establish and maintain discharge monitoring reports, to monitor point source discharges, and sample the discharges to check for

pollution. 33 U.S.C. § 1318(a). The federal regulations which correspond to the Clean Water Act define the phrase "owner or operator" as "the owner or operator of any 'facility or activity' subject to regulation under the NPDES program." 40 C.F.R. § 122.2.

Although the WVWPCA is slightly more specific about who is liable for permit violations, it still identifies the liable party as a "person." Section 22-11-22 specifically provides that "[a]ny person who violates any provision of any permit issued" pursuant to the WVWPCA is liable for penalties. W. Va. Code § 22-11-22.

One appellate decision may be particularly instructive given the nature of the Clean Water Act claims at issue in this appeal. In *West Virginia Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159 (4th Cir. 2010), the Fourth Circuit affirmed the trial court's ruling that WVDEP was required to obtain NPDES permits under the Clean Water Act for the state agency's own reclamation activities at abandoned coal mining sites. The Fourth Circuit reasoned, in part:

> The text of the [Clean Water Act], as well as the corresponding regulations issued by the Environmental Protection Agency, confirm that the permit requirements apply to anyone who discharges pollutants into the waters of the United States. Under the [Clean Water Act], it does not matter that a mining company may have created the conditions that call for reclamation. What matters is that an entity, private or public, is currently discharging pollutants into the waters of the United States. In fact, the statute contains no exceptions for state agencies engaging in reclamation efforts; to the contrary, it explicitly includes them within its scope.
>
> . . . .
>
> On its face, 33 U.S.C. § 1311(a) bans "the discharge of any pollutant by any person" regardless of whether that "person" was the root cause or merely the current superintendent of the discharge. In other words, the statute takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur.
>
> The EPA's regulatory interpretations of the statute confirm this point. The regulations make plain that it is the current operator of a mine site, rather than the initial owner, who must obtain a permit. *See* 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."). This provision seems to confirm that where, as here, the mine owner generates pollution but then abandons the site, the subsequent operator is the party responsible for obtaining a permit.

*W. Va. Highlands Conservancy*, 625 F.3d at 161, 167. *See also Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133 (10th Cir. 2005) (owner of property containing an inactive gold mine could be liable under the Clean Water Act for discharges of pollutants from an abandoned mine shaft, even though owner had never conducted any mining operations on the property).

> d.        *Application of Clean Water Act & West Virginia Water Pollution Control Act*

As with WVDEP's application for administrative expense claims under the SMCRA and the WVSCMRA, we hold that the bankruptcy court abused its discretion when it denied analogous administrative expense claims against AppFuels under the Clean Water Act and the West Virginia Water Pollution Control Act. The evidence in the current case, when viewed most favorably to WVDEP, indicates that AppFuels may be directly liable for claims associated with KDC Mining permits brought under the Clean Water Act or the West Virginia Water Pollution Control Act. For example, the Hagewood affidavit specifically stated that "[AppFuels] performed environmental reclamation and water treatment for all permits in West Virginia." This seems especially true given the Fourth Circuit's holding in *West Virginia Highlands Conservancy* that even a state agency responsible for treating wastewater at an abandoned mine must comply with the permitting requirements of the Clean Water Act. *See* 625 F.3d at 161, 167. We again caution, however, that we do not intend for our conclusions to imply that the record definitively establishes that AppFuels is in fact liable under either the Clean Water Act or the West Virginia Water Pollution Control Act for unlawful discharges or other violations associated with the KDC Mining permits.

Whether WVDEP has a valid administrative expense claim against AppFuels based on AppFuels' direct liability for postpetition violations of the Clean Water Act and the analogous West Virginia statute, and determining the amount of such claim, are complex matters best left for the bankruptcy court to determine in the first instance. Indeed, it is because of these complexities that environmental liabilities in Chapter 11 cases are often resolved through negotiated agreements. *See also* 11 U.S.C. § 502(c) (permitting estimation of contingent or unliquidated claims, "the fixing or liquidation of which . . . would unduly delay the administration of the case").

Turning our attention to AppPremFuels, we conclude that the bankruptcy court did not abuse its discretion when it denied WVDEP's direct liability administrative expense claims against

AppPremFuels under the Clean Water Act and the West Virginia Water Pollution Control Act. The evidence in the record, even when viewed most favorably toward WVDEP, did not demonstrate that AppPremFuels had any role with respect to any NPDES permits associated with the KDC Mining or reclamation activities. Hagewood stated in his affidavit that AppFuels, not AppPremFuels, was responsible for environmental reclamation and water treatment. Consequently, to the extent that the bankruptcy court determined that AppPremFuels had no joint and several liability for the reclamation obligations associated with the KDC Mining permits under the Clean Water Act and the West Virginia Water Pollution Control Act, that portion of the bankruptcy court's ruling is affirmed.

B.      *Remaining Issues*

WVDEP's administrative expense claims also included penalties for postpetition environmental claims that were not contingent on a finding of joint and several liability arising from the KDC permits. The bankruptcy court did not analyze these postpetition penalty claims in its decision. Nevertheless, the bankruptcy court denied the application for administrative expenses in its entirety, including these postpetition penalty claims. For example, among the claims included in WVDEP's application were stipulated penalties for postpetition discharges purportedly due under an administrative consent order entered into between AppFuels and WVDEP. While WVDEP included these and other purportedly postpetition penalties in its administrative expense claims, the bankruptcy court never addressed them. Rather, the bankruptcy court limited its analysis to the threshold question of whether WVDEP's arguments for joint and several liability failed as a matter of law. On appeal, WVDEP argues that the bankruptcy court abused its discretion in rejecting these claims. AppFuels and AppPremFuels assert that this argument was waived.

We hold that these claims were adequately preserved both before the bankruptcy court and on appeal. First, WVDEP informed the bankruptcy court that some of its administrative expense claims were not contingent on a finding of joint and several liability arising from the KDC permits. And while the bankruptcy court indicated that it would limit its initial analysis to the question of whether WVDEP's arguments for joint and several liability failed as a matter of law, nothing prevented the bankruptcy court from addressing these stipulated penalties and similar claims after resolving the threshold question it had posed. On appeal, WVDEP raised this argument in its

opening brief, albeit among a plethora of other arguments. While the argument was not presented at great length, it was a straightforward argument that did not require lengthy analysis. Under these circumstances, we hold that the claims were properly preserved. *Cf. McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) (issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived).

While WVDEP presented its stipulated penalties and postpetition discharge violations in a hodgepodge fashion and apparently included some prepetition violations that would not qualify as administrative expense claims under any circumstance, the bankruptcy court abused its discretion when it denied administrative expense claims that were independent of the threshold question of whether WVDEP's arguments for joint and several liability failed as a matter of law. We note again, however, that the list of alleged stipulated penalties and postpetition discharge violations identifies only AppFuels and not AppPremFuels, which is consistent with the statement in Hagewood's affidavit that AppFuels performed environmental reclamation and water treatment for all permits in West Virginia. Therefore, we affirm the denial of all administrative expense claims with respect to AppPremFuels.

The parties' remaining arguments, if not duplicative, are either incorrect or irrelevant to the Panel's determination of this appeal.

\* \* \*

To recap, we hold:

(1) that the parties and the bankruptcy court failed to properly analyze AppFuels' and AppPremFuels' potential liability for the reclamation obligations associated with the permits owned by their affiliate, KDC;

(2) that WVDEP's administrative expense claims against AppFuels and AppPremFuels were properly denied to the extent the claims were based on the theory of AppFuels' and AppPremFuels' derivative liability for the debts of their affiliate, KDC, either as a result of veil piercing under state law or substantive consolidation under federal common law;

(3) that the bankruptcy court abused its discretion when it denied WVDEP's administrative expense claims against AppFuels to the extent the claims were based on the theory of

AppFuels' direct liability for the reclamation obligations associated with the permits owned by AppFuels' affiliate, KDC;

(4) that the bankruptcy court did not abuse its discretion when it denied WVDEP's direct liability administrative expense claims against AppPremFuels; and

(5) that the bankruptcy court also abused its discretion when it denied WVDEP's administrative expense claims against AppFuels that were independent of the threshold question of whether AppFuels should be jointly and severally liable for the reclamation obligations associated with the permits owned by its affiliate, KDC, (for example, stipulated penalties for postpetition discharges purportedly due under an administrative consent order between AppFuels and WVDEP).

Upon remand, the bankruptcy court will need to determine AppFuels' liability for administrative expense claims to the extent the claims are based on the theory of

- AppFuels' direct liability for the reclamation obligations associated with the permits owned by KDC; or

- AppFuels' direct liability for other environmental obligations unrelated to the reclamation obligations associated with the permits owned by KDC (for example, stipulated penalties for postpetition discharges purportedly due under an administrative consent order between AppFuels and WVDEP).

Depending upon the bankruptcy court's ruling, the bankruptcy court may also need to address secondary issues that were not a part of its threshold determination, such as

- whether WVDEP's environmental claims are properly administrative expense claims as opposed to prepetition claims; and
- the amount of such claims.

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM in part and VACATE and REMAND in part for further proceedings consistent with this opinion.